JEAN ET AL. *v.* NELSON, COMMISSIONER, IMMIGRA-
TION AND NATURALIZATION SERVICE, ET AL.

No. 84-5240.   Argued March 25, 1985—Decided June 26, 1985

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, STEVENS, POWELL, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 858.

*Ira J. Kurzban* argued the cause for petitioners. With him on the briefs were *Bruce J. Winick, Irwin P. Stotzky, Christopher Keith Hall, Michael J. Rosen,* and *Robert E. Juceam.*

*Solicitor General Lee* argued the cause for respondents. With him on the briefs were *Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, Joshua I. Schwartz, Barbara L. Herwig,* and *Michael Jay Singer.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Immigration Lawyers Association by *Donald L. Ungar* and *Bill Ong Hing;* for Amnesty International U. S. A. by *Joan Hartman, Paul Hoffman,* and *Ralph Steinhardt;* for the Asian American Legal Defense and Education Fund et al. by *Linton Joaquin;* for Metropolitan Dade County et al. by *Robert A. Ginsburg, Dianne Saulney Smith, Lucia A. Dougherty,* and *Gisella Cardonne;* for the NAACP Legal Defense and Educational Fund, Inc., by *Julius LeVonne Chambers* and *Charles Stephen Ralston;* for the National Association for the Advancement of Colored People et al. by *Robert H. Kapp, Roderic V. O. Boggs,* and *Carolyn Waller;* for the National Coalition for Haitian Refugees et al. by *Wade J. Henderson;* for the Procedural Aspects of International Law Institute et al. by *Roberts B. Owen, David Carliner,* and *Sarah Wunsch;* and for the Lawyers Committee for International Human Rights et al. by *Arthur C. Helton, Harriet Rabb, Lucas Guttentag, Jeffrey P. Sinensky, Ruti G. Teitel,* and *Phil Baum.*

*Robert E. Jensen* filed a brief for the Federation for American Immigration Reform as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Washington Legal Foundation by *Daniel J. Popeo* and *George C. Smith;* for the American Civil Liberties Union by *Burt Neuborne* and *Charles S. Sims;* and for Aguilar-Ramos et al. by *Dale M. Schwartz* and *David A. Webster.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners, the named representatives of a class of undocumented and unadmitted aliens from Haiti, sued respondent Commissioner of the Immigration and Naturalization Service (INS). They alleged, *inter alia,* that they had been denied parole by INS officials on the basis of race and national origin. See 711 F. 2d 1455 (CA11 1983) (panel opinion) *(Jean I).* The en banc Eleventh Circuit concluded that any such discrimination concerning parole would not violate the Fifth Amendment to the United States Constitution because of the Government's plenary authority to control the Nation's borders. That court remanded the case to the District Court for consideration of petitioners' claim that their treatment violated INS regulations, which did not authorize consideration of race or national origin in determining whether or not an excludable alien should be paroled. 727 F. 2d 957 (1984) *(Jean II).* We granted certiorari. 469 U. S. 1071. We conclude that the Court of Appeals should not have reached and decided the parole question on constitutional grounds, but we affirm its judgment remanding the case to the District Court.

Petitioners arrived in this country sometime after May 1981, and represent a part of the recent influx of undocumented excludable aliens who have attempted to migrate from the Caribbean basin to south·Florida. Section 235(b) of the Immigration and Nationality Act, 66 Stat. 199, 8 U. S. C. § 1225(b), provides that "[e]very alien . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer." Section 212(d)(5)(A) of the Act, 66 Stat. 188, as amended, 8 U. S. C. § 1182(d)(5)(A), authorizes the Attorney General "in his discretion" to parole into the United States any such alien applying for admission "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest." The

statute further provides that such parole shall not be regarded as an admission of the alien, and that the alien shall be returned to custody when in the opinion of the Attorney General the purposes of the parole have been served.

For almost 30 years before 1981, the INS had followed a policy of general parole for undocumented aliens arriving on our shores seeking admission to this country. In the late 1970's and early 1980's, however, large numbers of undocumented aliens arrived in south Florida, mostly from Haiti and Cuba. Concerned about this influx of undocumented aliens, the Attorney General in the first half of 1981 ordered the INS to detain without parole any immigrants who could not present a prima facie case for admission. The aliens were to remain in detention pending a decision on their admission or exclusion. This new policy of detention' rather than parole was not based on a new statute or regulation. By July 31, 1981, it was fully in operation in south Florida.

Petitioners, incarcerated and denied parole, filed suit in June 1981, seeking a writ of habeas corpus under 28 U. S. C. § 2241 and declaratory and injunctive relief. The amended complaint set forth two claims pertinent here. First, petitioners alleged that the INS's change in policy was unlawfully effected without observance of the notice-and-comment rulemaking procedures of the Administrative Procedure Act (APA), 5 U. S. C. § 553. Petitioners also alleged that the restrictive parole policy, as executed by INS officers in the field, violated the equal protection guarantee of the Fifth Amendment because it discriminated against petitioners on the basis of race and national origin. Specifically, petitioners alleged that they were impermissibly denied parole because they were black and Haitian.

The District Court certified the class as "all Haitian aliens who have arrived in the Southern District of Florida on or after May 20, 1981, who are applying for entry into the United States and who are presently in detention pending exclusion proceedings . . . for whom an order of exclusion has

not been entered . . . ." *Louis* v. *Nelson*, 544 F. Supp. 1004, 1005 (SD Fla. 1982). After discovery and a 6-week bench trial the District Court held for petitioners on the APA claim, but concluded that petitioners had failed to prove by a preponderance of the evidence discrimination on the basis of race or national origin in the denial of parole. *Louis* v. *Nelson*, 544 F. Supp. 973 (1982); see also *id.*, at 1004.

The District Court held that because the new policy of detention and restrictive parole was not promulgated in accordance with APA rulemaking procedures, the INS policy under which petitioners were incarcerated was "null and void," and the prior policy of general parole was restored to "full force and effect," 544 F. Supp., at 1006. The District Court ordered the release on parole of all incarcerated class members, about 1,700 in number. See *ibid.* Additionally, the court enjoined the INS from enforcing a rule of detaining unadmitted aliens until the INS complied with the APA rulemaking process, 5 U. S. C. §§ 552, 553.

Under the District Court's order, the INS retained the discretion to detain unadmitted aliens who were deemed a security risk or likely to abscond, or who had serious mental or physical ailments. The court's order also subjected the paroled class members to certain conditions, such as compliance with the law and attendance at required INS proceedings. The court retained jurisdiction over any class member whose parole might be revoked for violating the conditions of parole.

Although all class members were released on parole forthwith, the District Court imposed a 30-day stay upon its order enjoining future use of the INS's policy of incarceration without parole. The purpose of this stay was to permit the INS to promulgate a new parole policy in compliance with the APA. The INS promulgated this new rule promptly. See 8 CFR § 212.5 (1985); 47 Fed. Reg. 30044 (1982), as amended, 47 Fed. Reg. 46494 (1982). Both petitioners and respond-

ents agree that this new rule requires even-handed treatment and prohibits the consideration of race and national origin in the parole decision. Except for the initial 30-day stay, the District Court's injunction against the prior INS policy ended the unwritten INS policy put into place in the first half of 1981. Some 100 to 400 members of the class are currently in detention; most of these have violated the terms of their parole but some may have arrived in this country after the District Court's judgment.[1] It is certain, however, that no class member is being held under the prior INS policy which the District Court invalidated. See *Jean II*, 727 F. 2d, at 962.

After the District Court entered its judgment, respondents appealed the decision on the APA claim and petitioners cross-appealed the decision on the discrimination claim. A panel of the Court of Appeals for the Eleventh Circuit affirmed the District Court's judgment on the APA claim, although on a somewhat different rationale than the District Court. *Jean I*, 711 F. 2d, at 1455. The panel went on to decide the constitutional discrimination issue as well, holding that the Fifth Amendment's equal protection guarantee applied to parole of unadmitted aliens, and the District Court's finding of no invidious discrimination on the basis of race or national origin was clearly erroneous. The panel ordered, *inter alia*, continued parole of the class members, an injunction against discriminatory enforcement of INS parole policies, and any further relief necessary "to ensure that all aliens, regardless of their nationality or origin, are accorded equal treatment." *Id.*, at 1509–1510.

---

[1] The record does not inform us of exactly how many class members are in detention, and whether these are postjudgment arrivals or original class members who violated the terms of their parole as set by the District Court. The precise makeup of the class may be addressed on remand. See Tr. of Oral Arg. 42; *Jean II*, 727 F. 2d 957, 962 (1984); Order on Mandate, *Louis* v. *Nelson*, No. 81–1260, p. 1, n. 1 (SD Fla. June 8, 1984); Record, Vol. 17, pp. 4014, 4026, 4035.

The Eleventh Circuit granted a rehearing en banc, thereby vacating the panel opinion. See 11th Cir. Ct. Rule 26(k). After hearing argument, the en banc court held that the APA claim was moot because the Government was no longer detaining any class members under the stricken incarceration and parole policy.[2] All class members who were incarcerated had either violated the terms of their parole or were postjudgment arrivals detained under the regulations adopted after the District Court's order of June 29, 1982. *Jean II, supra,* at 962. The en banc court then turned to the constitutional issue and held that the Fifth Amendment did not apply to the consideration of unadmitted aliens for parole. According to the court the grant of discretionary authority to the Attorney General under 8 U. S. C. § 1182(d)(5)(A) permitted the Executive to discriminate on the basis of national origin in making parole decisions.

Although the court in *Jean II* rejected petitioners' constitutional claim, it accorded petitioners relief based upon the current INS parole regulations, see 8 CFR § 212.5 (1985), which are facially neutral and which respondents and petitioners admit require parole decisions to be made without regard to race or national origin. Because no class members were being detained under the policy held invalid by the District Court, the en banc court ordered a remand to the District Court to permit a review of the INS officials' discretion under the nondiscriminatory regulations which were promulgated in 1982 and are in current effect. The court stated:

"The question that the district court must therefore consider with regard to the remaining Haitian detainees is thus not whether high-level executive branch officials such as the Attorney General have the discretionary authority under the Immigration and Nationality Act

---

[2] The APA issue is not before us and we express no view on it. The court in *Jean II* was presented with other issues, none germane to the issues we discuss today.

(INA) to discriminate between classes of aliens, but whether lower-level INS officials have abused their discretion by discriminating on the basis of national origin in violation of facially neutral instructions from their superiors." *Jean II*, 727 F. 2d, at 963.

The court stated that the statutes and regulations, as well as policy statements of the President and the Attorney General, required INS officials to consider aliens for parole individually, without consideration of race or national origin. Thus on remand the District Court was to ensure that the INS had exercised its broad discretion in an individualized and nondiscriminatory manner. See *id.*, at 978–979.

The court noted that the INS's power to parole or refuse parole, as delegated by Congress in the United States Code, *e. g.*, 8 U. S. C. §§ 1182(d)(5)(A), 1225(b), 1227(a), was quite broad. 727 F. 2d, at 978–979. The court held that this power was subject to review only on a deferential abuse-of-discretion standard. According to the court "immigration officials clearly have the authority to deny parole to unadmitted aliens if they can advance a 'facially legitimate and bona fide reason' for doing so." *Jean II, supra*, at 977, citing *Kleindienst* v. *Mandel*, 408 U. S. 753, 770 (1972).

The issue we must resolve is aptly stated by petitioners:

> "This case does not implicate the authority of Congress, the President, or the Attorney General. Rather, it challenges the power of low-level politically unresponsive government officials to act in a manner which is contrary to federal statutes . . . and the directions of the President and the Attorney General, both of whom provided for a policy of non-discriminatory enforcement." Brief for Petitioners 37.

Petitioners urge that low-level INS officials have invidiously discriminated against them, and notwithstanding the new neutral regulations and the statutes, these low-level agents will renew a campaign of discrimination against the

class members on parole and those members who are currently detained. Petitioners contend that the only adequate remedy is "declaratory and injunctive relief" ordered. by this Court, based upon the Fifth Amendment. The limited statutory remedy ordered by the court in *Jean II*, petitioners contend, is insufficient. For their part respondents are also eager to have us reach the Fifth Amendment issue. Respondents wish us to hold that the equal protection component of the Fifth Amendment has no bearing on an unadmitted alien's request for parole.

"Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Gulf Oil Co.* v. *Bernard,* 452 U. S. 89, 99 (1981); *Mobile* v. *Bolden,* 446 U. S. 55, 60 (1980); *Kolender* v. *Lawson,* 461 U. S. 352, 361, n. 10 (1983), citing *Ashwander* v. *TVA,* 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). This is a "fundamental rule of judicial restraint." *Three Affiliated Tribes of Berthold Reservation* v. *Wold Engineering,* 467 U. S. 138 (1984). Of course, the fact that courts should not decide constitutional issues unnecessarily does not permit a court to press statutory construction "to the point of disingenuous evasion" to avoid a constitutional question. *United States* v. *Locke,* 471 U. S. 84, 96 (1985). As the Court stressed in *Spector Motor Co.* v. *McLaughlin,* 323 U. S. 101, 105 (1944), "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." See also *United States* v. *Gerlach Livestock Co.,* 339 U. S. 725, 737 (1950); *Larson* v. *Valente,* 456 U. S. 228, 257 (1982) (STEVENS, J., concurring).

Had the court in *Jean II* followed this rule, it would have addressed the issue involving the immigration statutes and INS regulations first, instead of after its discussion of the Constitution. Because the current statutes and regulations

provide petitioners with nondiscriminatory parole consideration—which is all they seek to obtain by virtue of their constitutional argument—there was no need to address the constitutional issue.

Congress has delegated its authority over incoming undocumented aliens to the Attorney General through the Immigration and Nationality Act, 8 U. S. C. § 1101 *et seq.* The Act provides that any alien "who [upon arrival in the United States] may not appear to [an INS] examining officer . . . to be clearly and beyond a doubt entitled to land" is to be detained for examination by a special inquiry officer or immigration judge of the INS. 8 U. S. C. §§ 1225(b), 1226(a); see 8 CFR § 236.1 (1985). The alien may request parole pending the decision on his admission. Under 8 U. S. C. § 1182(d)(5)(A),

> "[t]he Attorney General may . . . parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States."

The Attorney General has delegated his parole authority to his INS District Directors under new regulations promulgated after the District Court's order in this case. See 8 CFR § 212.5 (1985). Title 8 CFR § 212.5 provides a lengthy list of neutral criteria which bear on the grant or denial of parole. Respondents concede that the INS's parole discretion under the statute and these regulations, while exceedingly broad, does not extend to considerations of race or national origin. Respondents' position can best be seen in this colloquy from oral argument:

> "Question: You are arguing that constitutionally you would not be inhibited from discriminating against these people on whatever ground seems appropriate. But as I understand your regulations, you are also maintaining

> that the regulations do not constitute any kind of discrimination against these people, and . . . your agents in the field are inhibited by your own regulations from doing what you say the Constitution would permit you to do."
>
> "Solicitor General: That's correct."  Tr. of Oral Arg. 28–29.

See also Brief for Respondents 18–19; 8 U. S. C. § 1182(d)(5)(A); 8 CFR § 212.5 (1985); cf. Statement of the President, United States Immigration and Refugee Policy (July 31, 1981), 17 Weekly Comp. of Pres. Doc. 829 (1981).  As our dissenting colleagues point out, *post,* at 862–863, the INS has adopted nationality-based criteria in a number of regulations. These criteria are noticeably absent from the parole regulations, a fact consistent with the position of both respondents and petitioners that INS parole decisions must be neutral as to race or national origin.[3]

---

[3] We have no quarrel with the dissent's view that the proper reading of important statutes and regulations may not be always left to the stipulation of the parties.   But when all parties, including the agency which wrote and enforces the regulations, and the en banc court below, agree that regulations neutral on their face must be applied in a neutral manner, we think that interpretation arrives with some authority in this Court.

The dissent relies upon such cases as *Young* v. *United States,* 315 U. S. 257, 259 (1942), and *Investment Company Institute* v. *Camp,* 401 U. S. 617 (1971), even though those cases have faint resemblance to this one.   In *Young* the Government confessed error, arguing that the Court of Appeals was wrong in its affirmance of a conviction under a broad reading of the Harrison Anti-Narcotics Act.   Because of the importance of a consistent interpretation of criminal statutes, we declined to adopt the Solicitor General's view, and rejected the Circuit Court's interpretation without ourselves considering and deciding the merits of the question.   See 315 U. S., at 258–259.   *Young* has little bearing on the interpretation of the INS regulations at issue today.

In *Camp* the Solicitor General attempted to defend a banking regulation promulgated by the Comptroller, which was in apparent conflict with federal banking statutes.   We rejected the gloss placed upon these statutes by the Solicitor General on appeal; the Comptroller had offered no pre-litigation administrative interpretation of these statutes, and the Solicitor

Accordingly, we affirm the en banc court's judgment insofar as it remanded to the District Court for a determination whether the INS officials are observing this limit upon their broad statutory discretion to deny parole to class members in detention. On remand the District Court must consider: (1) whether INS officials exercised their discretion under § 1182(d)(5)(A) to make individualized determinations of parole, and (2) whether INS officials exercised this broad discretion under the statutes and regulations without regard to race or national origin.

Petitioners protest, however, that such a nonconstitutional remedy will permit lower-level INS officials to commence parole revocation and discriminatory parole denial against class members who are currently released on parole. But these officials, while like all others bound by the provisions of the Constitution, are just as surely bound by the provisions of the statute and of the regulations. Respondents concede that the latter do not authorize discrimination on the basis of race and national origin. These class members are therefore protected by the terms of the Court of Appeals' remand from the very conduct which they fear. The fact that the protection results from the terms of a regulation or statute, rather than from a constitutional holding, is a necessary consequence of the obligation of all federal courts to avoid constitutional adjudication except where necessary.

The judgment of the Court of Appeals remanding the case to the District Court for consideration of petitioner's claims based on the statute and regulations is

*Affirmed.*

---

General's *post hoc* interpretation could not cure the conflict between the challenged regulation and the statutes.

The interpretation of INS regulations we adopt today involves no *post hoc* rationalizations of agency action. Unlike the Court in *Camp* we do not view the new INS policy or the interpretation of that policy agreed to by all parties and the en banc Court of Appeals to be merely a litigation stance in defense of the agency action which precipitated this litigation.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Petitioners are a class of unadmitted aliens who were detained at various federal facilities pending the disposition of their asylum claims. We granted certiorari to decide whether such aliens may invoke the equal protection guarantees of the Fifth Amendment's Due Process Clause to challenge the Government's failure to release them temporarily on parole. The Court today refuses to address this question, invoking the well-accepted proposition that constitutional issues should be avoided whenever there exist proper nonconstitutional grounds for decision. I, of course, have no quarrel with that proposition. Its application in this case, however, is more than just problematic; by pressing a regulatory construction well beyond "the point of disingenuous evasion," *United States* v. *Locke,* 471 U. S. 84, 96 (1985), the Court thrusts itself into a domain that is properly that of the political branches. Purporting to exercise restraint, the Court creates out of whole cloth nonconstitutional constraints on the Attorney General's discretion to parole aliens into this country, flagrantly violating the maxim that "amendment may not be substituted for construction," *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500, 518 (1926) (Taft, C. J.). In my mind, there is no principled way to avoid reaching the constitutional question presented by the case. Turning to that question, I would hold that petitioners have a Fifth Amendment right to parole decisions free from invidious discrimination based on race or national origin. I respectfully dissent.

## I

The Court's decision rests entirely on the premise that the parole regulations promulgated during the course of this litigation preclude INS officials from considering race and national origin in making parole decisions. *Ante,* at 852–853, 855. The Court then reasons that if petitioners can show

disparate treatment based on race or national origin, these regulations would provide them with all the relief that they seek. Thus, it sees no need to address the independent question whether such disparate treatment would also violate the Constitution, and invokes *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring), to avoid deciding that question. If the initial premise were correct, the Court's decision would be sound. But because it is not, the remainder of the Court's opinion simply collapses like a house of cards.

In support of its conclusion, the Court points to no authority other than arguments in the parties' briefs, which in turn cite nothing of relevance. The Court's failure to rely on any other authority is not surprising, for an examination of the regulations themselves, as well as the statutes and administrative practices governing the parole of unadmitted aliens, indicates that there are no nonconstitutional constraints on the Executive's authority to make national-origin distinctions.[1]

## A

Congress provided for the temporary parole of unadmitted aliens in § 212(d)(5)(A) of the Immigration and Nationality Act, 66 Stat. 188, as amended, 8 U. S. C. § 1182(d)(5)(A), which states in pertinent part that the Attorney General may "*in his discretion* parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States" (emphasis added). Pursuant to this statute, the INS promulgated regulations in 1958, in which the Attorney Gen-

---

[1] That the analysis would be different for race discrimination in no way detracts from the force of my argument. Petitioners complain in part about differential treatment based on national origin. Because neither the statute nor the regulations prohibit nationality distinctions, the Court errs in failing to address petitioners' constitutional arguments, at least insofar as they pertain to national-origin discrimination.

eral's discretionary authority was delegated to INS District Directors:

"The district director in charge of a port of entry may . . . parole into the United States temporarily in accordance with section 212(d)(5) of the act any alien applicant for admission . . . *as such officer shall deem appropriate.*" 23 Fed. Reg. 142 (1958), 8 CFR § 212.5 (1959) (emphasis added).

The quoted portion of the regulations remained unchanged in 1982, at the time of the trial in this case. See 8 CFR § 212.5 (1982).

The District Court found that between 1954 and 1981 most undocumented aliens detained at the border were paroled into the United States. *Louis* v. *Nelson,* 544 F. Supp. 973, 980, n. 18, 990 (SD Fla. 1982); see Brief for Respondents 3. During that period, physical detention was the exception, not the rule, and was "generally employed only as to security risks or those likely to abscond," *Leng May Ma* v. *Barber,* 357 U. S. 185, 190 (1958). See 544 F. Supp., at 990.

As the Court acknowledges, the Government's parole policy became far more restrictive in 1981. See *ante,* at 849. In June 1982, the District Court below enjoined enforcement of this new policy. *Louis* v. *Nelson,* 544 F. Supp. 1004, 1006 (final judgment). The District Court found that the INS had not complied with the Administrative Procedure Act (APA), 5 U. S. C. § 553, as it had not published notice of the proposed change and had not allowed interested persons to comment. See 544 F. Supp., at 997. As a result of the District Court's judgment, the INS promulgated new regulations in July 1982. See 47 Fed. Reg. 30044 (1982); 8 CFR § 212.5 (1982). According to the Court, these regulations, on which this case turns, provide a "lengthy list of neutral criteria which bear on the grant or denial of parole." *Ante,* at 855.

The new parole regulations track the two statutory standards for the granting of parole: "emergent reasons" and "reasons strictly in the public interest." They first provide that "[t]he parole of aliens who have serious medical conditions

in which continued detention would not be appropriate would generally be justified by 'emergent reasons.'" 8 CFR § 212.5(a)(1) (1985). The regulations then define five groups that would "generally come within the category of aliens for whom the granting of the parole exception would be 'strictly in the public interest', provided that the aliens present neither a security risk nor a risk of absconding." § 212.5(a)(2). The first four groups are pregnant women, juveniles, certain aliens who have close relatives in the United States, and aliens who will be witnesses in official proceedings in the United States. §§ 212.5(a)(2)(i)–(iv). The fifth category is a catchall: "aliens whose continued detention is not in the public interest as determined by the district director." § 212.5(a)(2)(v).[2]

Given the catchall provision, the regulations provide somewhat tautologically that it would generally be "strictly in the public interest" to parole aliens whose continued detention is not "in the public interest"; the "lengthy list" of criteria on which the Court relies so heavily is in fact an empty set.[3] Certainly the regulations do not provide either exclusive criteria to guide the "public interest" determination or a list of impermissible criteria. Moreover, they do not, by their terms, prohibit the consideration of race or national origin. As Judge Tjoflat aptly noted in his separate opinion below:

> "The policy in CFR is not a comprehensive policy . . . . It merely sets out a few specific categories of aliens . . . who the district director generally should parole in the absence of countervailing security risks. It leaves the

---

[2] The regulations also provide for the parole of aliens who are subject to prosecution in the United States. 8 CFR § 212.5(a)(3) (1985).

[3] To be sure, a District Director cannot parole an alien under 8 CFR § 212.5(a)(2) (1985) unless he determines that the alien "present[s] neither a security risk nor a risk of absconding." This condition, which has been a traditional prerequisite to parole, *Leng May Ma* v. *Barber*, 357 U. S. 185, 190 (1958), merely requires the District Director to make a threshold determination before he exercises his discretion. It is of no aid to the subsequent inquiry of defining the "public interest."

weighing necessary to making parole decisions regarding these categories, *as well as all other parole decisions, purely in the discretion of the district director.* Such a minimal directive is not enough to infer with any certainty that the Attorney General never wants district directors, in making parole decisions, to consider nationality." 727 F. 2d 957, 985–986 (CA11 1984) (concurring in part and dissenting in part) (emphasis added).

## B

Nor is a prohibition on the consideration of national origin to be found in the parole statute, pronouncements of the Attorney General and the INS, or the APA, the only other possible nonconstitutional sources for the constraints the Court believes are imposed upon the INS's District Directors. The first potential constraint, of course, is 8 U. S. C. § 1182(d)(5)(A), which vests full "discretion" over parole decisions in the Attorney General. There can be little doubt that at least national-origin distinctions are permissible under the parole statute if they are consistent with the Constitution. First, the grant of discretionary authority to the Attorney General over immigration matters is extremely broad. See 2 K. Davis, Administrative Law Treatise § 8:10 (2d ed. 1979); 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 8.14 (1985). For example, in *Hintopoulos* v. *Shaughnessy,* 353 U. S. 72 (1957), this Court held that, where Congress does not specify the standards that are to guide the Attorney General's exercise of discretion in the immigration field, the Attorney General can rely on any reasonable factors of his own choosing. *Id.,* at 78.

Moreover, with respect to other immigration matters in which Congress has vested similar discretion in the Attorney General, the INS, acting pursuant to authority delegated by the Attorney General, has specifically adopted nationality-based criteria. See, *e. g.,* 8 CFR § 101.1 (1985) (presumption of lawful admission for certain national groups); § 212.1 (documentary requirements for nonimmigrants of particular

nationalities); § 231 (arrival-departure manifests for passengers from particular countries); § 242.2(e) (nationals of certain countries entitled to special privilege of communication with diplomatic officers); § 252.1 (relaxation of inspection requirements for certain British and Canadian crewmen). These regulations indicate that the INS believes that nationality-based distinctions are not necessarily inconsistent with congressional delegation of "discretion" over immigration decisions to the Executive. That interpretation of the statutes is, of course, entitled to deference. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844–845 (1984).

My conclusion that the parole statute leaves room for nationality-based distinctions is consistent with the Government's position before the en banc Court of Appeals. The brief filed by Assistant Attorney General McGrath in that court explicitly stated that "the Executive is not precluded from drawing nationality-based distinctions, for Congress has delegated the full breadth of its parole and detention authority to the Attorney General." En Banc Brief of Alan C. Nelson in No. 82–5772 (CA11 1983), p. 18. In maintaining that the parole statute does not proscribe differential treatment based on national origin, the Government added:

> "Congress knows how to prohibit nationality-based distinctions when it wants to do so. In the absence of such an express prohibition, it should be presumed that the broad delegation of authority encompasses the power to make nationality-based distinctions." *Id.*, at 11.

The conclusion that Congress did not provide the constraint identified by the Court does not end the inquiry, as the Attorney General could have narrowed the discretion that the regulations vest in the District Directors. For example, he could have published interpretive rules, staff instructions, or policy statements making clear that this discretion did not extend to race or national-origin distinctions. But throughout this litigation, the Government has pointed

to absolutely no evidence that the Attorney General in fact chose to narrow the discretion of District Directors in this manner. Moreover, neither the INS's Operations Instructions nor its Examinations Handbook, which provide guidance to INS officers in the field, indicate that race and national origin cannot be taken into account in making parole decisions.

The final possible constraint comes from the APA's requirement that administrative action not be arbitrary, capricious, or an abuse of discretion, 5 U. S. C. § 706(2)(A). See *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 411 (1971); *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140–141 (1967). For better or worse, however, nationality classifications have played an important role in our immigration policy. There is thus no merit to the argument that it is arbitrary, capricious, or an abuse of discretion for a District Director to take nationality into account in making parole decisions under 8 CFR § 212.5 (1985). See also *supra,* at 862 (discussing Attorney General's discretion). In summary, the Court's conclusion that, aside from constitutional constraints, the parole regulations prohibit national-origin distinctions draws no support from anything in the regulations themselves or in the statutory and administrative background to those regulations.

C

The Court's view that the regulations are neutral with respect to race and national origin is based only on the representations of the Solicitor General and the purported agreement of the parties.[4] On the first point, the Court states: "Respondents concede that the INS's parole discretion under

---

[4] The Court also appears to share the Court of Appeals' misconception that the new regulations somehow changed the substantive standards for parole. By the INS's own admission, however, those regulations merely "sought to codify existing Service practices." See 47 Fed. Reg. 46494 (1982).

the statute and these regulations, while exceedingly broad, does not extend to considerations of race or national origin." *Ante*, at 855. Such reliance on the Solicitor General's interpretation of agency regulations is misplaced.

An agency's reasonable interpretation of the statute it is empowered to administer is entitled to deference from the courts, and will be set aside only if it is inconsistent with the clear intent of Congress. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc., supra,* at 844. Similarly, an agency's interpretation of its own regulations is of "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (1945); see *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 566 (1980); *United States* v. *Larionoff*, 431 U. S. 864, 872 (1977). These presumptions do not apply, however, to representations of appellate counsel. As we stated in *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971): "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands. It is the administrative official and not appellate counsel who possess the expertise that can enlighten and rationalize the search for the meaning and intent of Congress." *Id.*, at 628; see *Motor Vehicle Mfrs. Assn.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U. S. 29, 50 (1983); *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168–169 (1962). The same considerations apply, of course, to appellate counsel's interpretation of regulations.

The Solicitor General's representations to this Court are not supported by citation to any authoritative statement by the Attorney General or the INS to the effect that the statute and regulations prohibit distinctions based on race or national origin. See Brief for Respondents 18–19. Indeed, "except for some too-late formulations, apparently coming from the Solicitor General's office," *Citizens to Preserve Overton Park* v. *Volpe, supra,* at 422 (opinion of Black, J.), we have been directed to no relevant indication that the administrative

practice was to prohibit such distinctions.[5]   See *supra*, at 862–863.   The Solicitor General's contention to the contrary is merely an unsupported assertion by counsel for a litigant; this Court owes it no deference at all.[6]

---

[5] The Court's conclusion that the Solicitor General's statements are not mere *"post hoc* rationalizations for agency action," *ante*, at 857, n. 3, is untenable.   Before this Court, the Solicitor General argues that the INS is precluded by the statute and regulations from making nationality-based distinctions.   At trial, however, the Government argued the opposite, namely, that "nationality may well be a factor that leads to parole." Record, Vol. 47, p. 1858.   Because the substantive criteria for parole have not changed during the course of this litigation, see n. 4, *supra*, the Solicitor General's representations are flatly inconsistent with the Government's own position at trial; they reflect nothing but a change in the Government's litigation strategy.   This is precisely the sort of *post hoc* rationalization that is entitled to no weight.   See *Motor Vehicle Mfrs. Assn.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U. S. 29, 50 (1983).

[6] At trial, one Government witness, Associate Attorney General Giuliani, stated that "if the statute is being applied discriminatorily, it is being applied in violation of the policies of the Attorney General."   Record, Vol. 49, p. 2343.   This witness, however, did not indicate what he meant by "discrimination," and did not point to any specific "policies."   To the extent that he was referring to distinctions based on national origin, his statement was inconsistent with the Government's own theory.   See n. 5, *supra*.

Moreover, the District Court found "inconsistencies between what the Government witnesses said the policy was and the policy their subordinates were carrying out," as a result of "the absence of guidelines for detention and parole." *Louis* v. *Nelson*, 544 F. Supp. 973, 981, n. 24 (SD Fla. 1982).   Similarly, the panel of the Court of Appeals properly found that Associate Attorney General Giuliani's testimony contradicted the testimony of INS Commissioner Alan C. Nelson, one of the respondents in this case, as well as statements by former INS Commissioner Doris Meissner.   711 F. 2d 1455, 1471 (CA11 1983).   The unsupported, uncredited, and contradicted assertions of one Government witness are of course insufficient to establish the existence of an administrative practice.   Not surprisingly, the Government does not direct this Court's attention to that testimony.

Finally, the Government's position at trial that it had not in fact treated Haitians differently from other detained aliens sheds no light on the entirely separate question of whether different treatment would have been inconsistent with the statutes and regulations.

The Court also relies on the purported agreement between petitioners and the Solicitor General that the regulations require parole decisions to be made without regard to race or national origin. *Ante,* at 852. First, I do not read petitioners' arguments as the Court does. In my mind, the main thrust of the relevant portion of petitioners' brief is that the regulations in question set out neutral criteria for parole. See Brief for Petitioners 7–10, 30, 37, 38. Unless such criteria are exclusive, however, they are not necessarily inconsistent with distinctions based on race or national origin. Certainly no plausible argument can be made that the criteria of 8 CFR § 212.5(a) (1985) were intended to be exclusive. See *supra,* at 861.

More importantly, this Court's judgments are precedents binding on the lower courts. Thus, the proper interpretation of an important federal statute and regulations, such as are at issue here, cannot be left merely to the stipulation of parties. See *Young* v. *United States,* 315 U. S. 257, 259 (1942); see also *Sibron* v. *New York,* 392 U. S. 40, 59 (1968). The Court's construction of the administrative policy in this case will have implications far beyond the confines of this litigation.[7]

In fact, the Court's decision casts serious doubt on the validity of numerous immigration policies. As I have already mentioned, many statutes in the immigration field vest "discretion" in the Attorney General. The Court's restrictive view of the Attorney General's discretionary authority with respect to parole decisions, adopted in the face of no authoritative statements limiting such discretion, will presumably affect the scope of his permissible discretion in areas other than parole decisions. Moreover, because the Court does not explain what in the language or policy underlying any relevant statute, regulation, or administrative practice, lim-

---

[7] In addition, the Court cites the President's Statement on United States Immigration and Refugee Policy (17 Weekly Comp. of Pres. Doc. 829 (1981)). Nothing in that Statement is relevant to the question whether national-origin distinctions are consistent with the statute and regulations.

its the Attorney General's discretion only with respect to the consideration of race and national origin, its opinion can be read to preclude the Attorney General from making distinctions based on other factors as well. Such a result is inconsistent with well-established precedents of immigration law and threatens to constrain severely the Executive's ability to address our Nation's pressing immigration problems. This is indeed a costly way to avoid deciding constitutional issues. See *supra*, at 858.

## II

Having shown that the Court's interpretation of the regulations is untenable, I turn to consider the constitutional question presented by this case: May the Government discriminate on the basis of race or national origin in its decision whether to parole unadmitted aliens pending the determination of their admissibility? The en banc Court of Appeals rejected petitioners' constitutional claim, holding that *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206 (1953), compels the conclusion that petitioners "cannot claim equal protection rights under the fifth amendment, even with regard to challenging the Executive's exercise of its parole discretion." 727 F. 2d, at 970.[8] Before this Court, the Government takes the same position, arguing that "*Mezei* is directly on point." Brief for Respondents 40. I agree that broad dicta in *Mezei* might suggest that an undocumented alien detained at the border does not enjoy *any* constitutional

---

[8] The Court of Appeals acknowledged that its holding was squarely at odds with the holding of the Court of Appeals for the Tenth Circuit in *Rodriguez-Fernandez* v. *Wilkinson*, 654 F. 2d 1382 (1981). See 727 F. 2d, at 974–975. Moreover, the Court of Appeals for the Second Circuit has suggested that unadmitted aliens can invoke the protections of the Constitution. See *Augustin* v. *Sava*, 735 F. 2d 32, 37 (1984) ("it appears likely that some due process protection surrounds the determination of whether an alien has sufficiently shown that return to a particular country will jeopardize his life or freedom"); *Yiu Sing Chun* v. *Sava*, 708 F. 2d 869, 877 (1983) (a refugee's "interest in not being returned may well enjoy some due process protection").

protections, and therefore cannot invoke the equal protection guarantees of the Fifth Amendment's Due Process Clause. See also *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 544 (1950); *Kwong Hai Chew* v. *Colding*, 344 U. S. 590, 601 (1953). This broad dicta, however, can withstand neither the weight of logic nor that of principle, and has never been incorporated into the fabric of our constitutional jurisprudence. Moreover, when stripped of its dicta, *Mezei* stands for a narrow proposition that is inapposite to the case now before the Court.

## A

Ignatz Mezei arrived in New York in 1950 and was temporarily excluded from the United States by an immigration inspector acting pursuant to the Passport Act. Pending disposition of his application for admission, he was detained at Ellis Island. A few months after his arrival and initial detention, the Attorney General entered a permanent order of exclusion, on the "basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest . . . for security reasons." 345 U. S., at 208. Mezei was not told what this information was and was given no opportunity to present evidence of his own.

Mezei then began a year-long search for a country willing to accept him. All of his attempts to find a new home failed, however, as did the State Department's efforts on his behalf. As a result, Mezei "sat on Ellis Island because this country shut him out and others were unwilling to take him in." *Id.*, at 209.

Seeking a writ of habeas corpus, Mezei argued that the Government's refusal to inform him of the reasons for his continued detention violated due process. *United States ex rel. Mezei* v. *Shaughnessy*, 101 F. Supp. 66, 68 (SDNY 1951). The District Court ordered the Government to disclose those reasons but gave it the option of doing so *in camera*. After the Government refused to comply altogether, the District Court directed Mezei's conditional parole on

bond. A divided panel of the Court of Appeals for the Second Circuit affirmed the parole order but, in a 5–4 decision, this Court reversed.

The Court first distinguished between aliens who have entered the United States, whether legally or illegally, and those who, like Mezei and petitioners here, are detained at the border as they attempt to enter. The former group, the Court reasoned, could be expelled "only after proceedings conforming to traditional standards of fairness encompassed in due process of law." 345 U. S., at 212. The Court, however, refused to afford such protections to the latter group. Citing *United States ex rel. Knauff* v. *Shaughnessy, supra,* the Court stated: "'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" 345 U. S., at 212 (quoting 338 U. S., at 544).

In *Knauff*, a 4–3 decision, an alien married to a United States citizen had sought to enter the United States to be naturalized. Upon arrival at our border, she was detained at Ellis Island. Eventually, and without a hearing, she was permanently excluded from the United States on the basis of undisclosed confidential information. The Court refused to find a constitutional right to a hearing prior to exclusion, stating that "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff* v. *Shaughnessy, supra,* at 543. Even though the procedural challenge in *Mezei* was not related to an exclusion order, but instead to the Government's refusal to temporarily parole an alien who already had been deemed excludable, the Court in *Mezei* did not distinguish between the two situations. Instead, it followed *Knauff* as if it were directly on point.

Justices Black, Frankfurter, Douglas, and Jackson dissented in *Mezei*. Focusing on Mezei's detention on Ellis Island, Justice Jackson asked: "Because the respondent has no right of entry, does it follow that he has no rights at

all?" 345 U. S., at 226 (Jackson, J., joined by Frankfurter, J., dissenting). He concluded that this detention could be enforced only through procedures "which meet the test of due process of law." *Id.*, at 227. Similarly, Justice Black stated that "individual liberty is too highly prized in this country to allow executive officials to imprison and hold people on the basis of information kept secret from courts." *Id.*, at 218 (Black, J., joined by Douglas, J., dissenting). He too thought that "Mezei's continued imprisonment without a hearing violate[d] due process of law." *Id.*, at 217.

The statement in *Knauff* and *Mezei* that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned," lies at the heart of the Government's argument in this case. This language suggests that aliens detained at the border can claim no rights under the Constitution. Further support for that view comes from *Kwong Hai Chew* v. *Colding, supra,* which was decided after *Knauff* but one month before *Mezei.* The alien in *Chew* was a permanent resident of the United States who was "excluded" upon his return to this country following a 5-month trip abroad as a crewman on an American merchant ship. The Court declined to follow *Knauff*, which, it stated, "relates to the rights of an alien entrant and does not deal with the question of a resident alien's right to be heard." *Kwong Hai Chew* v. *Colding,* 344 U. S., at 596. The Court then stated that a resident alien, unlike an alien entrant, "is a person within the protection of the Fifth Amendment." *Ibid.* Focusing on Chew's hybrid status—that of a resident alien attempting to enter the United States—the Court said:

> "While it may be that a resident alien's ultimate right to remain in the United States is subject to alteration by statute or authorized regulation because of a voyage undertaken by him to foreign ports, it does not follow that he is thereby deprived of his constitutional right to procedural due process. *His status as a person within the*

*meaning and protection of the Fifth Amendment cannot be capriciously taken from him." Id.*, at 601 (emphasis added).

In the Court's view, because he was a resident alien, Chew was a "person" for the purposes of the Fifth Amendment. Also under the Court's view, however, the Executive's characterization of Chew as a first-time entrant—rather than a resident alien—was equivalent to taking away his status as a "person" for the purposes of constitutional coverage.

The broad and ominous nature of the dicta in *Knauff*, *Chew*, and *Mezei* becomes clear when one realizes that they apply not only to aliens outside our borders, but also to aliens who are physically within the territory of the United States and over whom the Executive directly exercises its coercive power. Moreover, the dicta do not apply only to aliens in detention at modern-day Ellis Islands; they apply also to individuals who literally live within our midst, as our case law establishes that aliens temporarily paroled into the United States have no more rights than those in detention. See *Kaplan v. Tod*, 267 U. S. 228 (1925).

## B

"It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. Virginia*, 6 Wheat. 264, 399 (1821) (Marshall, C. J.). The narrow question decided in *Knauff* and *Mezei* was that the denial of a hearing in a case in which the Government raised national security concerns did not violate due process. See also *infra*, at 877. The question decided in *Chew* was that the alien's due process rights *had* been violated. The broad notion that "'excludable' aliens . . . are not within the protection of the Fifth

Amendment," *Kwong Hai Chew* v. *Colding, supra,* at 600, on which the Government heavily relies in this case, Brief for Respondents 28–29, is therefore clearly dictum, and as such it is entitled to no more deference than logic and principle would accord it. Under this standard, the broad dictum in question deserves no deference at all.

Our case law makes clear that excludable aliens do, in fact, enjoy Fifth Amendment protections. First, when an alien detained at the border is criminally prosecuted in this country, he must enjoy at trial all of the protections that the Constitution provides to criminal defendants. As early as *Wong Wing* v. *United States,* 163 U. S. 228 (1896), the Court stated, albeit in dictum, that while Congress can "forbid aliens or classes of aliens from coming within [our] borders," it cannot punish such aliens without "a judicial trial to establish the guilt of the accused." *Id.,* at 237. The right of an unadmitted alien to Fifth Amendment due process protections at trial is universally respected by the lower federal courts and is acknowledged by the Government. See, *e. g., United States* v. *Henry,* 604 F. 2d 908, 912–913 (CA5 1979); *United States* v. *Casimiro-Benitez,* 533 F. 2d 1121 (CA9), cert. denied, 429 U. S. 926 (1976); Brief in Opposition 20–21. Surely it would defy logic to say that a precondition for the applicability of the Constitution is an allegation that an alien committed a crime. There is no basis for conferring constitutional rights only on those unadmitted aliens who violate our society's norms.

Second, in *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481 (1931), the Court held that a corporation "duly organized under, and by virtue of, the Laws of Russia," *id.,* at 487, could invoke the Fifth Amendment to challenge an unlawful taking by the Federal Government. The corporation in that case certainly had no more claim to being "within the United States" than do the aliens detained at Ellis Island. Nonetheless, the Court broadly stated that *"[a]s alien friends are embraced within the terms of the Fifth*

*Amendment,* it cannot be said that their property is subject to confiscation here because the property of our citizens may be confiscated in the alien's country." *Id.,* at 491–492 (emphasis added). Under the dicta in the *Knauff-Chew-Mezei* trilogy, however, an alien could not invoke the Constitution to challenge the conditions of his detention at Ellis Island or at a similar facility in the United States. It simply is irrational to maintain that the Constitution protects an alien from deprivations of "property" but not from deprivations of "life" or "liberty." Such a distinction is rightfully foreign to the Fifth Amendment.

Third, even in the immigration context, the principle that unadmitted aliens have no constitutionally protected rights defies rationality. Under this view, the Attorney General, for example, could invoke legitimate immigration goals to justify a decision to stop feeding all detained aliens. He might argue that scarce immigration resources could be better spent by hiring additional agents to patrol our borders than by providing food for detainees. Surely we would not condone mass starvation. As Justice Jackson stated in his dissent in *Mezei:*

> "Does the power to exclude mean that exclusion may be continued or effectuated by any means which happen to seem appropriate to the authorities? It would effectuate [an alien's] exclusion to eject him bodily into the sea or to set him adrift in a rowboat. Would not such measures be condemned judicially as a deprivation of life without due process of law?" 345 U. S., at 226–227.

Only the most perverse reading of the Constitution would deny detained aliens the right to bring constitutional challenges to the most basic conditions of their confinement.

Fourth, any limitations on the applicability of the Constitution within our territorial jurisdiction fly in the face of this Court's long-held and recently reaffirmed commitment

to apply the Constitution's due process and equal protection guarantees to all individuals within the reach of our sovereignty. "These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369 (1886). Indeed, by its express terms, the Fourteenth Amendment prescribes that "[n]o State . . . shall deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." In *Plyler* v. *Doe*, 457 U. S. 202 (1982), we made clear that this principle applies to aliens, for "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term." *Id.*, at 210; see also *Mathews* v. *Diaz*, 426 U. S. 67, 77 (1976). Such emphasis on universal coverage is not surprising, given that the Fourteenth Amendment was specifically intended to overrule a legal fiction similar to that undergirding *Knauff*, *Chew*, and *Mezei*—that freed slaves were not "people of the United States." *Scott* v. *Sandford*, 19 How. 393, 404 (1857).

Therefore, it cannot rationally be argued that the Constitution provides no protections to aliens in petitioners' position. Both our case law and pure logic compel the rejection of the sweeping proposition articulated in the *Knauff-Chew-Mezei* dicta. To the extent that this Court has relied on *Mezei* at all, it has done so only in the narrow area of entry decisions. See, *e. g.*, *Landon* v. *Plasencia*, 459 U. S. 21, 32 (1982); *Kleindienst* v. *Mandel*, 408 U. S. 753, 766 (1972). It is in this area that the Government's interest in protecting our sovereignty is at its strongest and that individual claims to constitutional entitlement are the least compelling. But even with respect to entry decisions, the Court has refused to characterize the authority of the political branches as wholly unbridled. Indeed, "[o]ur cases reflect acceptance of a limited judicial responsibility under the Constitution even with

respect to the power of Congress to regulate the admission and exclusion of aliens." *Fiallo* v. *Bell*, 430 U. S. 787, 793, n. 5 (1977).[9]

Regardless of the proper treatment of constitutional challenges to entry decisions, unadmitted aliens clearly enjoy constitutional protections with respect to other exercises of the Government's coercive power within our territory. Of course, this does not mean that the Constitution requires that the rights of unadmitted aliens be coextensive with those of citizens. But, "[g]ranting that the requirements of due process must vary with the circumstances," the Court is obliged to determine whether decisions concerning the parole of unadmitted aliens are consistent with due process, and it cannot "pass back the buck to an assertedly all-powerful and unimpeachable Congress." Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1394 (1953) (discussing *Knauff* and *Mezei*). The proper constitutional inquiry must concern the scope of the equal protection and due process

---

[9] Even in the 1950's, *Mezei* was heavily criticized by academic commentators. See, *e. g.*, Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1392–1396 (1953) (describing the rationale behind *Mezei* as "a patently preposterous proposition"); 1 K. Davis, Administrative Law Treatise § 7.15, pp. 479–482 (1958); see also 2 K. Davis, Administrative Law Treatise § 11:5, p. 358 (2d ed. 1979) ("The holding that a human being may be incarcerated for life without opportunity to be heard on charges he denies is widely considered to be one of the most shocking decisions the Court has ever rendered"); Martin, Due Process and the Treatment of Aliens, 44 U. Pitt. L. Rev. 165, 176 (1983) (describing *Mezei* as "a rather scandalous doctrine, deserving to be distinguished, limited, or ignored"); Schuck, The Transformation of Immigration Law, 84 Colum. L. Rev. 1, 20 (1984) ("[among] the most deplorable governmental conduct toward both aliens and American citizens ever recorded in the annals of the Supreme Court"); Developments in the Law—Immigration Policy and the Rights of Aliens, 96 Harv. L. Rev. 1286, 1322–1324 (1983); Note, Constitutional Limits on the Power to Exclude Aliens, 82 Colum. L. Rev. 957 (1982).

rights at stake, and not whether the Due Process Clause can be invoked at all.

## C

The Government argues, however, that the parole decision at issue here is no different from an entry decision, and it maintains that the holding of the Court of Appeals is compelled not only by the broad dicta in *Mezei* but also by *Mezei*'s actual holding. In support of this position, the Government seizes on one phrase in *Mezei*—that to temporarily admit an alien "nullifies the very purpose of the exclusion proceeding." 345 U. S., at 216. It is simply untenable to weave a broad principle out of the anomalous facts of *Mezei*.

The most obvious—and controlling—difference between the two cases is that the alien in *Mezei* had already been excluded on security grounds when he sought parole. Under the circumstances, parole would have had the same pernicious effects that the order of exclusion was designed to protect against. Indeed, to the extent that Mezei's presence in this country was a threat to our national security, the threat flowing from his temporary parole was as serious as that resulting from his admission. Activities such as espionage and sabotage can accomplish their objectives quickly; it does not necessarily take years to steal sensitive materials or blow up strategic buildings. Under the idiosyncratic facts of *Mezei*, it was reasonable that the alien's rights with respect to admission and parole were deemed coextensive.

In contrast, the petitioners in this case have not been excluded from the United States. In fact, the reason that they are still in this country is that the Government has not yet performed its statutory duty to evaluate their applications for admission. More importantly, there is no argument here that security questions are at stake, and there is no reason to believe that petitioners' parole would "nullify the purpose" of their potential exclusion in some other way. As a matter of course, we admit tourists, students, and other short-term

visitors whom we would not want to have permanently in our midst. Whatever immigration goals might be compromised by actually admitting petitioners would not necessarily be compromised similarly by paroling them pending the determination of their admissibility. Here, unlike in *Mezei*, parole and admission cannot be evaluated by the same yardstick.

This case is different from *Mezei* in other important ways. One such distinction is well captured in the Government's brief in *Mezei:*

> "[I]f the court below is correct in determining that an alien who can find no country to give him refuge is entitled at least to temporary admittance here, it follows that the more undesirable an alien is, the better are his chances of admission, since the less likely he is to find other countries willing to accept him. In fact, if he is undesirable enough, he may attain what amounts to permanent residence in this country since no other nation will ever take him in." Brief for Petitioner in No. 52–139, O. T. 1952, p. 19.

Through parole, *Mezei* could have gained the same important substantive immigration rights that he already had been denied when he was excluded. In contrast, petitioners here could gain no such rights. Their parole could be terminated at any time at the discretion of the Attorney General, and their admissibility would then be determined at exclusion proceedings just as if they had never been paroled. See 8 U. S. C. § 1182(d)(5)(A); *Leng May Ma* v. *Barber*, 357 U. S., at 188; *Kaplan* v. *Tod*, 267 U. S., at 230; 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 2.54, p. 2–374 (1985). Whereas parole will never give petitioners a "foothold in the United States," *Kaplan* v. *Tod, supra,* at 230, it might have made it possible for Mezei to stay here indefinitely.

Moreover, Mezei's incentives to look for a country willing to take him would have disappeared had he been released

from Ellis Island and allowed to return to his wife and home in Buffalo, N. Y. See *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S., at 217 (Black, J., dissenting). In this case, the same incentives are simply not present.

Turning from substance to procedure, I find that the Court's refusal to accord Mezei the procedural due process rights that he sought—namely, to know what information the Government had relied upon—had less to do with Mezei's status as an alien than with the Court's willingness to defer to the Executive on national security matters in the midst of the Cold War. Indeed, in *Jay* v. *Boyd*, 351 U. S. 345 (1956), the Court upheld the Govenment's use of similar confidential information in a deportation proceeding. Even though the Court recognized that "a resident alien in a deportation proceeding has constitutional protections unavailable to a nonresident alien seeking entry into the United States," *id.*, at 359, it nonetheless relied on *Knauff* and *Mezei* to dismiss the alien's claim, 351 U. S., at 358–359. In doing so, it noted that the constitutionality of the Government's practice gave it "no difficulty." *Id.*, at 357, n. 21. In *Jay*, the Court viewed *Knauff* and *Mezei* as national security cases and not as cases involving aliens attempting to enter the United States. In this case, in contrast, no national security considerations are said to be at stake.

Finally, whatever *Mezei* may have held about procedural due process rights in connection with parole requests is not applicable to the separate constitutional question whether the Government may establish a policy of making parole decisions on the basis of race or national origin without articulating any justification for its discriminatory conduct. As far back as *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886), the Court recognized that even decisions over which the Executive has broad discretion, and which the Executive may make without providing notice or a hearing, cannot be made in an invidiously discriminatory manner. Under the statute that the Court reviewed in *Yick Wo*, the State did not have to give reasons for its decision to prosecute violators of an ordinance

making it illegal under most circumstances to maintain a laundry without consent of the board of supervisors. Yet the Court held that the ordinance could not be applied selectively in a manner that discriminated against Chinese-Americans. Finding that the law was "applied and administered by a public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances," the Court reversed the convictions of those who had violated the ordinance. *Id.*, at 373–374. More recently, in *Mt. Healthy City School District Board of Education* v. *Doyle*, 429 U. S. 274 (1977), we stated that an employee who "could have been discharged for no reason whatever, and had no constitutional right to . . . the decision not to rehire him, [could] nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Id.*, at 283–284 (citation omitted); see also *Heckler* v. *Chaney*, 470 U. S. 821, 838 (1985). Thus, the Attorney General's broad discretion in the immigration area is not a license to engage in invidious discrimination.

## D

This dissent is not the place to determine the precise contours of petitioners' equal protection rights, but a brief discussion might clarify what is at stake. It is clear that, consistent with our constitutional scheme, the Executive enjoys wide discretion over immigration decisions. Here, the Government would have a strong case if it showed that (1) refusing to parole Haitians would slow down the flow onto United States shores of undocumented Haitians, and that (2) refusing to parole other groups would not have a similar deterrent effect. Then, its policy of detaining Haitians but paroling other groups might be sufficiently related to the valid immigration goal of reducing the number of undocumented aliens arriving at our borders to withstand constitu-

tional scrutiny.   Another legitimate governmental goal in this area might be to reduce the time it takes to process applications for asylum.   If the challenged policy serves that goal, then arguably it should be upheld, provided of course that it is not too underinclusive.

It is also true that national origin can sometimes be a permissible consideration in immigration policy.   But even if entry quotas may be set by reference to nationality, national origin (let alone race) cannot control every decision in any way related to immigration.   For example, that the Executive might properly admit into this country many Cubans but relatively few Haitians does not imply that, when dealing with aliens in detention, it can feed Cubans but not feed Haitians.

In general, national-origin classifications have a stronger claim to constitutionality when they are employed in connection with decisions that lie at the heart of immigration policy. Cf. *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 116 (1976) ("[D]ue process requires that [an agency's] decision to impose [a] deprivation of an important liberty . . . be justified by reasons which are properly the concern of that agency"). When central immigration concerns are not at stake, however, the Executive must recognize the individuality of the alien, just as it must recognize the individuality of all other persons within our borders.   If in this case the Government acted out of a belief that Haitians (or Negroes for that matter) are more likely than others to commit crimes or be disruptive of the community into which they are paroled, its detention policy certainly would not pass constitutional muster.

### III

The narrow question presented by this case is whether, in deciding which aliens will be paroled into the United States pending the determination of their admissibility, the Government may discriminate on the basis of race and national

origin even in the absence of any reasons closely related to immigration concerns. To my mind, the Constitution clearly provides that it may not. I would therefore reverse the judgment of the Court of Appeals and remand for a determination of the scope of petitioners' equal protection rights.

The Court instead disposes of this case through reliance on a statutory and regulatory analysis that finds no support in either the statute or the regulations. I therefore dissent.