## ANDREW W. COOK *v.* WARDEN, STATE PRISON*

Superior Court, Judicial District of Tolland
File No. CV-03-0004199S

Memorandum filed February 10, 2005

*Andrew W. Cook*, pro se, the petitioner.

*Madeline Melchionne*, assistant attorney general, for the respondent.

DYER, J. Andrew W. Cook, the pro se petitioner, filed this action for habeas corpus relief on October 9, 2003. The petition was amended on November 14, 2003. On May 3, 2004, this court granted in part the motion to dismiss the petition filed by the respondent, the warden of the state prison.[1] The court denied the motion with respect to the petitioner's claim that he was refused parole status because the state board of pardons and

---

* An appeal to the Appellate Court by the petitioner was filed July 5, 2005. The appeal subsequently was dismissed. *Cook* v. *Commissioner of Correction*, 99 Conn. App. 904, 916 A.2d 129 (2007).

[1] See memorandum of decision dated May 3, 2004.

paroles (board) allegedly utilizes a racially based quota system that favors black and Hispanic inmates. The petitioner, who is a white inmate, claims that the board's denial of his parole application was based on his race and thus violated his constitutional right to equal protection under the law.

In his answer, the respondent denied the petitioner's allegations and asserted that his decision was based on appropriate criteria and not on the petitioner's gender, race, religion or ethnicity.

A trial on the petitioner's surviving habeas claim was held before this court on November 1, 2004. The court has carefully considered all of the evidence presented at trial and the arguments of both parties. The court finds that the facts subsequently set forth were proven by a preponderance of the evidence.

I

FINDINGS OF FACT

On January 13, 2003, Judge Patrick Clifford sentenced the petitioner at Superior Court for the judicial district of New London (Docket No. CR-02-84348T) to a total effective term of four years incarceration followed by three years of special parole. This sentence was imposed as a result of the petitioner's November 14, 2002 conviction on one count of illegal possession of explosives in violation of General Statutes § 29-348. The petitioner is currently serving that sentence in the custody of the department of correction.

The board conducted an administrative review of the petitioner's suitability for parole on September 19, 2003. Based upon that review, the board denied the petitioner's release on parole and declined to set a new parole

hearing date. The board cited the following reasons for its decision to refuse parole: the nature or circumstances of the offense for which the petitioner was convicted; the petitioner's prior criminal history; the petitioner's poor performance while on probation; the fact that the offense was committed while the petitioner was on community release status from an earlier period of incarceration; and, the petitioner's poor institutional adjustment while incarcerated. A notation on the board's hearing disposition form noted that the petitioner's criminal history involved guns and violence.

Prior to rendering its decision, the board reviewed a parole summary report that included a recitation of the facts surrounding the petitioner's arrest for illegally possessing a pipe bomb in January, 2002. The report also contained information about the petitioner's prior criminal history in Connecticut and Rhode Island, his deportment while incarcerated, his involvement in therapeutic programs offered by the department of correction and his plans for obtaining employment and living quarters upon release from custody.

From the parole summary report, the board was aware that the petitioner was released from jail to transitional supervision for only two months when he was found to be in possession of the pipe bomb and arrested for the offense that led to his current incarceration. The board was also cognizant that the petitioner had five prior arrests in Connecticut and ten previous arrests in Rhode Island. He was arrested in Connecticut on charges that included illegal weapons possession, larceny in the third degree, three counts of violation of probation, harassment in the second degree, criminal trespass in the first degree and burglary in the third degree. The offense information specifically alleged that in 1998, the petitioner threatened to blow up a

building and kill a security guard at an office of the department of children and families. The summary also noted: "[The petitioner] has 10 arrests in Rhode Island from 1982-1996 for assault on [an] officer, disorderly conduct, consuming alcohol while underage, firing in [a] compact area, using [a] dangerous weapon, possession of controlled substances, possession of [a] firearm by [a] criminal, possession of [a] firearm after conviction of [a] crime, possession of [a] stolen object, larceny of a firearm, robbery, receiving stolen goods, breaking and entering at night and trespassing on [a] railroad right of way."

The parole summary report that was submitted to the board also listed the petitioner's five most recent alleged prison disciplinary violations. The allegations included claims that while in prison he had caused a disruption, made preparations for escape, engaged in threatening and possessed contraband. The report also indicated that the petitioner had a long and chronic history of substance abuse and had completed two institutional treatment programs during his current period of confinement.

At trial, the petitioner submitted statistics compiled by the respondent in support of his claims that the board engages in a quota system that favors black and Hispanic inmates and discriminates against white inmates in parole determinations.

A statistical analysis of department of correction records indicates that on September 1, 2003, Connecticut's incarcerated inmate population consisted of the following racial composition percentages: black—43.6 percent; white—27.9 percent; Hispanic—27.7 percent; Asian—0.6 percent; and Native American—0.2 percent. During the period from January, 2000, through Decem-

ber, 2003, the percentages of parole applications granted for the three predominant racial groups were as follows:

|          | 2000 | 2001 | 2002 | 2003 |
|----------|------|------|------|------|
| White    | 41%  | 49%  | 50%  | 48%  |
| Black    | 52%  | 56%  | 58%  | 62%  |
| Hispanic | 52%  | 57%  | 56%  | 61%  |

Additional statistics show that from the time period of 1997 to 2000, the average sentence length of an inmate granted parole varied significantly based on the underlying offenses. Drug, violation of probation, property and other offenses (e.g., failure to appear, escape, criminal attempt) all had very similar sentence lengths prior to parole release. The notable exception was violent offenses, which had a significantly longer average sentence length before parole release. During the time period of January, 2000, to December, 2003, the total parole applications, broken down by the three predominant races, as well as the percentage of inmates from each racial classification that obtained parole (indicated in parentheses) were as follows:

|          | 2000 | 2001 | 2002 | 2003 |
|----------|------|------|------|------|
| White    | 23.70% (19.73%) | 24.69% (21.98%) | 24.38% (21.78%) | 24.47% (20.17%) |
| Black    | 47.70% (50.44%) | 47.82% (49.27%) | 48.47% (50.83%) | 47.05% (50.00%) |
| Hispanic | 28.06% (29.42%) | 26.92% (27.96%) | 26.82% (26.91%) | 28.01% (29.25%) |

These numbers reveal that over the four year period of 2000–2003, a smaller percentage of whites who applied for parole release were granted such release, and, conversely, that a higher percentage of blacks and Hispanics who applied for parole release were granted such release. This court cannot, however, make any findings as to the reasons why these variations exist because there is no substantive evidence addressing these variations.

The board's parole docket for September, 2003, was introduced into evidence by the petitioner and reflects

all of the cases considered by the respondent during that month.[2] The docket indicates the applicants' race, their offenses and the parole disposition for each case. With respect to the 372[3] cases heard during September, 2003, the racial composition of the applicants considered was as follows: white—91 (24.46 percent); black—175 (47.04 percent); Hispanic—103 (27.69 percent); Native American—1 (0.27 percent); and Asian—2 (0.54 percent).[4] Based on the raw data contained in the parole docket, the court has compiled the following statistical breakdown, by racial group, of the various dispositions during September, 2003:

|  | Hispanic (103) | Black (175) | White (91) |
|---|---|---|---|
| Reparoled[5] | 9.71% (10) | 10.29% (18) | 4.40% (4) |
| Rescinded or Revoked[6] | 13.59% (14) | 9.14% (16) | 5.49% (5) |
| Voted to Parole[7] | 49.51% (51) | 57.71% (101) | 54.95% (50) |
| Denied with stated grounds | 16.50% (17) | 12.00% (21) | 24.18% (22) |
| Reinstated | N/A | 0.57% (1) | 1.10% (1) |
| Special Parole | 0.97% (1) | 0.57% (1) | N/A |
| Continued | 9.71% (10) | 9.14% (16) | 9.89% (9) |
| Inmate Waived | N/A | 0.57% (1) | N/A |

[2] This summary of the cases considered by the board in September, 2003, was compiled by the board as a result of a hearing conducted before this court on August 16, 2004. The purpose of the August 16, 2004 hearing was to consider the petitioner's pro se applications for the issuance of subpoenas and, if granted, to ascertain the proper scope of any granted subpoenas. The document entitled "Parole Docket" for the month of September, 2003, was produced by the board as a result of the court's order on the applications for subpoenas.

[3] The docket is number 1-370. There is, however, an entry designated "4A" as well as two entries numbered "183." Consequently, there are 372 entries on the docket.

[4] The percentages for the three predominant races are almost identical to those cited earlier in part II of this memorandum of decision regarding the racial makeup of the inmate population for the month of September, 2003.

[5] Includes "Revoked/reparole" as well as "Rescinded/reparole."

[6] Includes "Rescinded/no new hearing" and "Revoked/no new hearing."

[7] Includes "Voted to parole/detainer."

The data for September, 2003, indicates that approximately 50 percent or slightly more than half of all inmates, regardless of race, were voted to parole release.

The board's chairman, Gregory Everett, testified during trial. Everett testified that the decision to grant or deny parole involves a highly individualized review process that can vary from case to case. Everett testified that the board bases its decisions on specific factors such as an inmate's criminal history and past performance on probation or parole. He denied that an inmate's race, gender and ethnicity are considered by the board, and he further testified that the board does not use quotas in its determination process.

Additional testimony about the board's procedures and decision-making process was presented by parole supervisor Richard Sparaco. Sparaco also testified about the individual factors in an inmate's history that are considered when the board reviews their suitability for parole. He noted that an inmate's eligibility for parole status does not mean they are suitable for release back into the community on parole. The court found this testimony by both Everett and Sparaco to be credible.

At trial, Everett also specifically testified about the petitioner's history of criminal activity and institutional adjustment. Per Everett, the petitioner's criminal history is "unique" because it encompasses both an extensive history of violent behavior and offenses, as well as a pattern of escalating violence. Everett opined that the petitioner presents a risk to public safety due to his poor performance in previous community supervision programs and his negative prison disciplinary history. Everett additionally testified that as a result of Public Acts 2004, No. 04-234,[8] the petitioner will receive another parole hearing at a future date. Here, too, the

[8] As a result of Public Acts 2004, No. 04-234, General Statutes § 54-125a (d) requires that the board hold a hearing to determine the petitioner's suitability for parole release upon his completion of 75 percent of his definite

court found Everett's testimony to be both credible and substantiated by other documentary evidence.[9]

## II

## DISCUSSION

The amended petition alleges that the board is violating the petitioner's right to equal protection under both the federal and state constitutions[10] by making parole release decisions based on a racial quota system. More specifically, the petitioner alleges that he was denied parole release because of racial discrimination, caused by discrimination arising from a quota system employed by the board that unfairly advantages black and Hispanic inmates over white inmates. The petitioner alleges that this quota system results in the board's voting inmates to parole based not on their suitability but instead according to a numerical formula that is based on race.

"[S]uch a claim raises constitutional questions of the utmost seriousness, not only for the integrity of a particular [proceeding] but also for the perceived fairness of the judicial system as a whole." *State* v. *Gonzalez*, 206 Conn. 391, 394, 538 A.2d 210 (1998) (equal protection claim arising out of criminal jury selection). "To establish a violation of the equal protection clause of the fourteenth amendment to the United States constitution, the [petitioner] must prove that the [board] discriminated against him based on an impermissible,

or aggregate sentence. The petitioner's suitability for parole release will be reassessed, in accordance with the criteria specified in § 54-125a (d), at such time.

[9] That evidence included, in particular, the presentence investigation report, as well as the parole board mental health consultation.

[10] Section 1 of the fourteenth amendment to the constitution of the United States and article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, both safeguard the right to equal protection of the law. Article first, § 20, of the state constitution, as amended, also provides: "No person shall . . . be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

invidious classification. . . . Therefore, the [petitioner] must prove that the action had a discriminatory effect and that it was motivated by a discriminatory purpose. . . . Put another way, the [petitioner] must establish that he, compared with others similarly situated, was selectively treated . . . and . . . that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." (Citations omitted; internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 673, 822 A.2d 205 (2003).

The court will assume, without deciding, that the petitioner is similarly situated to all inmates seeking parole release. *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 831, 860 A.2d 715 (2004). The petitioner must then prove that the board's decision denying him parole release had a discriminatory effect and that it was motivated by a discriminatory purpose. Stated differently, the petitioner must show, based on his claim, that he was selectively treated (i.e., denied parole when it should have been granted) and that this treatment was based on the impermissible consideration of race (i.e., the fact that the petitioner is white instead of black or Hispanic).

As this court previously indicated in its memorandum of decision on the respondent's motion to dismiss, Connecticut's parole statute, which is similar to the federal parole statute at issue in *Jean* v. *Nelson*, 472 U.S. 846, 105 S. Ct. 2992, 86 L. Ed. 2d 664 (1985), requires that officials consider the merits of potential parolees' cases without consideration of race. The board's discretion under the statute, "while exceedingly broad, does not extend to considerations of race . . . ." Id., 855. Decisions regarding suitability for parole release are based on the race neutral criteria specified in General Statutes § 54-125a (a): "[that] (1) it appears from all available

information, including any reports from the Commissioner of Correction that the panel may require, that there is reasonable probability that such inmate will live and remain at liberty without violating the law, and (2) such release is not incompatible with the welfare of society . . . ."

The petitioner here has not proven by a preponderance of the evidence that the board deviated from the race neutral statutory criteria and, consequently, discriminated against him because of his race. The evidence presented established that the board had ample reason to conclude that the petitioner was not currently a suitable candidate for parole and that releasing him would pose a risk to the community. The petitioner's lengthy criminal record, which includes serious offenses, poor performance in supervised release programs and probation and a negative disciplinary record while incarcerated, all suggest a reasonable probability that the petitioner would not be able to live at liberty without violating the law. Put another way, the respondent has proven that his decision to deny parole was based on the petitioner's conduct and not his race.

The petitioner's claim in the present case is very similar to that raised by the petitioner in *McCleskey* v. *Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). In *McCleskey*, the petitioner claimed that a statistical "study demonstrate[d] that he was discriminated against because of his race and because of the race of his victim." Id., 292. The Supreme Court began its analysis "with the basic principle that [someone] who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination. . . . A corollary to this principle is that [the petitioner] must prove that the purposeful discrimination had a discriminatory effect on him. . . . Thus, to prevail under the Equal Protection Clause, [the petitioner] must prove that the decisionmakers in *his* case acted with discriminatory

purpose." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id.

The petitioner in *McCleskey* offered "no evidence specific to his own case that would support an inference that racial considerations played a part [in the outcome of the proceedings]. Instead, he relie[d] solely on the [statistical] study. [The petitioner] argue[d] that the [statistical] study compels an inference that his sentence reste[d] on purposeful discrimination." Id., 292–93.

The *McCleskey* court noted that the "statistical proffer must be viewed in the context of [the] challenge. [The petitioner] challenge[d] decisions at the heart of the State's criminal justice system. [O]ne of society's most basic tasks is that of protecting the lives of its citizens . . . . Implementation of . . . laws [that seek to achieve this task] necessarily requires discretionary judgments. Because discretion is essential to the criminal justice process, we would demand *exceptionally clear proof* before we would infer that the discretion has been abused. The unique nature of the decisions at issue in this case also counsels against adopting such an inference from the disparities indicated by the [statistical] study." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 297. The *McCleskey* court ultimately held that the statistical study presented by the petitioner was "clearly insufficient to support an inference that any of the decisionmakers in [the petitioner's] case acted with discriminatory purpose." Id.

The record in the present matter is devoid of any evidence that shows that the board considers an inmate's race when it strives to determine the suitability for parole release. Nor has the petitioner shown that the board took into consideration *his* race. Instead, the evidence shows that he was denied parole release based on the board's assessment of the petitioner's current

offense and sentence, as well as his criminal and institutional histories.

Similar to *McCleskey*, the present petitioner has not offered any evidence specific to his own case that would support an inference that racial considerations played a part in the outcome of the board's decision on his parole suitability. The petitioner has also failed to show that the board acted with discriminatory purpose in his case. Last, the statistical evidence falls far short of constituting any substantive proof that would permit this court to infer that the board abused its inherent discretion and purposefully acted out of a preference for, or antipathy toward, any racial or ethnic group.

### III

### CONCLUSION

Based upon the foregoing, the court finds that the petitioner has failed to prove the claim raised in his amended petition. His petition for a writ of habeas corpus is, therefore, denied.