# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AHILAN NADARAJAH,
           *Petitioner-Appellant,*

           v.

ALBERTO R. GONZALES, Attorney
General; TOM RIDGE; MICHAEL J.
GARCIA; RON SMITH; HECTOR
NAJERA; BARBARA WAGNER,
Warden, in their official
capacities,
           *Respondents-Appellees.*

No. 05-56759

D.C. No.
CV-04-01939-LAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
March 7, 2006—Pasadena, California

Filed March 17, 2006

Before: Sidney R. Thomas and Richard C. Tallman,
Circuit Judges, and James M. Fitzgerald,* District Judge.

Opinion by Judge Thomas

*The Honorable James M. Fitzgerald, Senior United States District
Judge for the District of Alaska, sitting by designation.

**COUNSEL**

Ranjana Natrarajan, Ahilan T. Arulanatham, Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, California, and Jordan C. Budd, ACLU Foundation of San Diego and Imperial Counties, San Diego, California, for the appellant.

Christopher C. Fuller, Michael P. Lindemann, and Peter D. Keisler, United States Department of Justice, Washington, D.C., for the appellee.

Molly K. Beutz and James J. Silk, Allard K. Lowenstein International Human Rights Clinic, Yale Law School, New Haven, Connecticut, for the amicus curiae.

**OPINION**

THOMAS, Circuit Judge:

Starting at age 17, Ahilan Nadarajah was repeatedly tortured in Sri Lanka. He fled to the United States where he was detained upon arrival. He applied for asylum, withholding of removal, and protection under the Convention Against Torture. Twice, the government's arguments against the grant of immigration relief have been rejected and Nadarajah has been awarded relief by an immigration judge. This decision was affirmed by the Board of Immigration Appeals. Yet, the government continues to detain Nadarajah, who has now been imprisoned for almost five years despite having prevailed at every administrative level of review and who has never been

charged with any crime. We order that a writ of habeas corpus issue, and that he be released on appropriate conditions during the pendency of any further proceedings.

I

This is a case about one individual, but as with most immigration cases, it can only be understood in the larger context of country conflict. The backdrop of this case is the quarter century-old battle between the government of Sri Lanki and a group known as the Liberation Tigers of Tamil Eelam ("LTTE") that seeks the creation of an independent state in areas in Sri Lanka inhabited by ethnic Tamils. The Tamils are an ethnic group who live in southern India and on Sri Lanka, an island of 19 million people off the southern tip of India. Tamils comprise about 18 percent of the island's population, and most live in its northern and eastern areas. Their Hindu religion and Tamil language set them apart from the three-quarters of Sri Lankans who are Sinhalese—members of a largely Buddhist, Sinhala-speaking ethnic group.

The LTTE separatist group, also known as the Tamil Tigers, have used conventional, guerrilla, and terror tactics in the decades-old civil war with the Sri Lankan government that has claimed more than 60,000 lives and displaced hundreds of thousands of Sri Lankans. Based on its conflict with the Sri Lankan government, the United State Department of State has listed the LTTE as a foreign terrorist organization. After the terrorist attacks against the United States on September 11, 2001, the LTTE declared a cease-fire against the Sri Lankan government. In 2002, the LTTE and the Sri Lankan government signed a formal cease-fire accord. The cease-fire remains in effect; however, there have been outbreaks of sporadic violence in the area.

Ahilan Nadarajah is a 25 year old native and citizen of Sri Lanka.[1] He is a member of the Tamil ethnic minority. Nadara-

---

[1]Because the Immigration Judge and the BIA found Nadarajah credible, we assume for purposes of this Opinion that the following facts are true based on his testimony in the asylum hearings.

jah lived with his family in the Jaffna peninsula at the north of Sri Lanka. He finished his schooling at age 17, and was working as a farmer on land that his family owned. In 1995, the Sri Lankan army invaded and shelled the area, displacing his family to the town of Vanni, some 60 kilometers from Jaffna. While they were leaving Jaffna by bicycle, one of the shells hit and killed Nadarajah's older brother. Eighteen months later, in April of 1997, his family returned to Jaffna, but because their home was occupied by the Sri Lankan army, they stayed with an aunt, two kilometers away.

Shortly thereafter, Nadarajah first had problems with the Sri Lankan army. On May 22, 1997, around 4:30 a.m., six or seven soldiers came into the home, beat him, blindfolded him, and took him to their camp. Because he had been in Vanni, his attackers accused him of membership in the LTTE, which he denied. For four months, Nadarajah was kept in the army camp, where he was regularly questioned and tortured. His questioners asked him to admit LTTE membership; when he refused, they tortured him, with methods that included beating him, sometimes with boards and gun handles, hanging him upside down, pricking his toenails with needles and burning him with cigarette butts. He still bears the scars from those torture sessions. He was eventually released when his mother bribed an army commander.

On October 5, 2000, Nadarajah was again arrested in his home, this time by agents of the opposition Elam People's Democratic Party ("EPDP"). When he denied their accusations of LTTE membership, he was beaten and taken to an EPDP camp. Nadarajah testified that the EPDP camp was funded by and connected to the Sri Lankan government. For a month, he was beaten and locked inside "a dark, dirty room," and forced to do menial labor. After a month of his mother's begging, he was permitted to leave the camp in November of 2000, but required to report every morning for two months.

Nadarajah was again arrested, by the Sri Lankan army, on July 10, 2001. A group of 15 to 20 soldiers approached him and his brother while they were working in a garden and took them into custody. Although his brother was soon released because of poor health, Nadarajah was detained for a month, during which he was again tortured:

> Q.   In what ways did they abuse you?
>
> A.   They hung me upside down and they beat me. While hanging upside down they brought a bag of gasoline, put my head inside that bag and tied me. * * * About 30 to 40 seconds I fainted. When I opened my eyes I was in my room. * * * They [also] tied my toes together and one person will pull one side and the others, the other person will pull it. And the other person pulled my head. They would fill the plastic bag with sand and they will beat me with that. * * * [And t]hey burned me with cigarette butts.

Nadarajah was released when his mother again bribed an official. He was told it was the last time he would be released and he ought to leave the country. Accompanied and funded by an uncle, Nadarajah departed immediately for Colombo, with plans to go to Canada.

In October of 2001, Nadarajah left Sri Lanka, having obtained a passport and exit documents through a smuggler. He traveled through Thailand, South Africa, Brazil and then Mexico before reaching the United States on October 27, 2001. He was apprehended by U.S. immigration officials at the border, and has been detained since.

On November 9, 2001, the Immigration and Naturalization Service granted Nadarajah parole from custody, conditioned, inter alia, on payment of a $20,000 bond. Unable to pay the bond, Nadarajah remained in custody. Nadarajah requested that the bond amount be decreased on at least three occasions,

but these requests were denied. On August 9, 2004, counsel for Nadarajah attempted to present $20,000 to secure his parole under the 2001 terms. However, the United States Bureau of Immigration and Customs Enforcement ("ICE") was "unwilling to accept the bond, stating that the previous order granting Mr. Nadarajah parole was 'stale' and ICE could not honor it."

In November of 2001, removal proceedings began against Nadarajah. He conceded removability and applied for asylum and other relief, claiming past persecution and fear of future persecution on account of his ethnicity and imputed political opinion. The government obtained two continuances; not until April 21, 2003, was a hearing held at which Nadarajah testified. The government opposed Nadarajah's asylum application on the grounds that he was affiliated with the LTTE, an allegation supported by the affidavit of an ICE agent who had received information from a confidential informant.

Despite the government's allegations and "some discrepancies" in Nadarajah's testimony, the immigration judge ("IJ") found Nadarajah credible, noting that his testimony was consistent and supportive of his asylum claim. The IJ granted asylum and relief under the Convention Against Torture.

On April 25, 2003, the government filed a motion to reopen the removal proceedings to introduce additional evidence, namely, to present the testimony of a Department of Homeland Security ("DHS") agent. The IJ denied the motion, and the government appealed to the Board of Immigration Appeals ("BIA" or "Board"). The BIA granted the motion to reopen and remanded to the IJ. In its remand order, the BIA instructed the IJ to hear evidence in the form of testimony by the DHS witness, special agent Schultz, even though the IJ had given the DHS two postponements in order to present its witness without the witness appearing.

Proceedings were held on June 8 and August 18, 2004. Agent Schultz testified, as well as Nadarajah's expert witness.

Schultz testified that his knowledge of the matter came from research that "involved reviewing public information that was available on the [LTTE] from State Department reports, Amnesty International reports[, speaking] to people in the Canadian government that were considered experts on the ground, and [speaking to] an ass[e]t of the Royal Canadian Mounted Police who is an expert regarding the group." When asked about the reliability of his Canadian sources, Schultz replied that he "had no reason to question their reliability. So [he] assumed that everything they told [him] was true." His faith in his sources was buttressed when he received "an anonymous letter that [he] believe[d] was postmarked in California[, and a] lot of the information in that anonymous letter was the same as the information that [he] had received from the Canadian officials." According to the informant, the area of Jaffna where Nadarajah lived was LTTE controlled, and it would have been impossible for him to exit the area without the approval and assistance of the LTTE. Therefore, concluded Schultz, Nadarajah must have been at least affiliated with the LTTE.

Schultz also investigated the 20 Tamils smuggled with Nadarajah. Schultz read the statements of all of the aliens, and concluded that, in all 21 cases, "almost the entire declaration was rehearsed [and coached], because they were so similar":

> I read their declarations, and I read the I-213s, and they were all very similar, which led me to believe that they were coached. Also, considering the fact that they're from the same general part of the world, they all entered within a few days of each other, all in the same general area, and came up with the same almost exact story as far as their background and their routes of travel, it appeared to me that they had been coached.

In addition, since the first hearing, the informant had told Schultz of a May 2003, telephone call that Nadarajah had

made, along with a female detainee and LTTE member named Satchithananthan held at the same facility, to order that someone in Canada be killed.

On cross-examination, when asked how Nadarajah and Satchithananthan could have made the call "together" at the gender-segregated detention facility, Schultz responded:

> I could only say that's what I wrote. I mean I, I don't know. And I didn't say that I knew. I didn't say it was one telephone call. I said both of these individuals placed a telephone call to Toronto. * * * So it could have been on different days, it could have been at different times.

Schultz had no answer as to why he had not attempted to monitor the telephones at the facility, or even subpoena the phone records.

Nadarajah's expert, Robert Oberst, is a professor of political science and specialist in South Asian politics at Nebraska Wesleyan University. He has served as an advisor to the United States government in various capacities, has published at least 75 articles on Sri Lanka, as well as four books (including the most widely used textbook on South Asia) and has spent a total of at least three to four years living in Sri Lanka, most recently in 2003, when he spent nine months in the country. Oberst testified that, in his research, he is very skeptical of informants' claimed identities, and often disbelieves his purported informants. In his opinion, it was unlikely that the LTTE would smuggle individuals out of Colombo, an area controlled by the Sri Lankan army. Further, Oberst testified that the area of Jaffna where Nadarajah lived was under Sri Lankan army control, and there was a military base near his aunt's house. As a result, in Oberst's opinion, it was highly unlikely that the LTTE would be in any way involved in smuggling a Tamil person out of this area.

After assessing the new evidence, the IJ concluded that "this Court finds nothing of significance which would seriously alter the Court's original finding." The IJ therefore reinstated his prior order granting Nadarajah asylum.

After the IJ's second decision granting asylum, Nadarajah's counsel submitted letters dated September 3 and 8, 2004, again requesting parole. These requests were denied by San Diego ICE Field Office Director Ronald Smith on September 20, 2004, pursuant to an August 13, 2004, determination by ICE that Nadarajah "no longer m[et] the criteria for a bond."

After the IJ's second opinion and after his request for parole was denied, Nadarajah filed his habeas petition with the District Court for the Southern District of California. More than one year after he filed the petition, it was denied by the district court. This timely appeal followed.

Subsequently, on January 5, 2006, the BIA affirmed the IJ's second opinion granting Nadarajah relief. The BIA dismissed the appeal and ordered the record remanded to the IJ "for the purpose of allowing [DHS] the opportunity to complete or update identity, law enforcement, or security investigations or examinations, and further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h)." (citing Background and Security Investigations in Proceedings Before the Immigration Judges and the Board of Immigration Appeals, 70 Fed. Reg. 4743, 4752-54 (Jan 31, 2005)). The next day, in an unusual move, the BIA Chairperson referred the case to the Attorney General for review, "seek[ing] guidance from the Attorney General on whether he wishes to exercise his discretion and de novo review authority in this case of national interest where the Board applied the standard of review required by 8 C.F.R. § 1003.1(d)(3)." The BIA did not provide for Nadarajah's release from detention, where he remains without any established timeline for a decision on when he may be released from detention.

This appeal is confined to the district court's denial of the petition for a writ of habeas corpus and the agency's denial of parole. We review the district court's decision to grant or deny a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2241 de novo. *Singh v. Ashcroft*, 351 F.3d 435, 438 (9th Cir. 2003). We review the decision to deny parole under 8 U.S.C. § 1182(d)(5)(A) for abuse of discretion, and the agency's parole decision will be upheld if supported by a "facially legitimate and bona fide reason." *Jean v. Nelson*, 472 U.S. 846, 853 (1985) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972)).

## II

**[1]** Although neither party has raised the question of jurisdiction, we are obligated to consider it *sua sponte*. *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 300-02 (1984). The district court asserted habeas corpus jurisdiction pursuant to 28 U.S.C. § 2241. On May 11, 2005, Congress enacted the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 310-11 (amending 8 U.S.C. § 1252). The REAL ID Act amends the Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (June 27, 1952), by eliminating federal habeas corpus jurisdiction over final orders of removal in favor of petitions for review that raise "constitutional claims or questions of law." 8 U.S.C. § 1252(b)(9) (as amended by REAL ID Act § 106(a)(2)). However, this provision only applies to federal habeas corpus jurisdiction over "final orders of removal." *Id.* By its terms, the jurisdiction-stripping provision does not apply to federal habeas corpus petitions that do not involve final orders of removal. Here, as we have noted, there is no final order of removal. To the contrary, Nadarajah has prevailed at every administrative level. Therefore, in cases that do not involve a final order of removal, federal habeas corpus jurisdiction remains in the district court, and on appeal to this Court, pursuant to 28 U.S.C. § 2241.

III

Nadarajah challenges his confinement on statutory and constitutional grounds. "[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Gulf Oil Co v. Bernard*, 452 U.S. 89, 99 (1981). Therefore, we must first examine whether the government has the statutory authority to detain Nadarajah indefinitely. *See Ma v. Ashcroft*, 257 F.3d 1095, 1104 (9th Cir. 2001) (as amended) ("[W]e must first determine whether Congress provided the INS with the authority to detain [the alien petitioner] indefinitely, as the Attorney General contends.").

In construing the applicable statutes, we are governed by the canon of constitutional avoidance, which requires a statute to be construed so as to avoid serious doubts as to the constitutionality of an alternate construction. *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.").

In addition, "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (citations omitted).

A

The DHS claims the authority to detain Nadarajah indefinitely under the general immigration detention statutes: 8 U.S.C. §§ 1225(b)(1)(B)(ii) and (b)(2)(A). The former statute provides:

> If the [asylum] officer determines at the time of the interview [upon arrival in the United States] that an

alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum.

And the latter:

[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under 8 U.S.C. § 1229a.

**[2]** These general detention statutes do not authorize Nadarajah's indefinite detention. In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court addressed the legality of detention of aliens who had been ordered removed under 8 U.S.C. § 1231(a)(6).[2] Reasoning that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem," and that Congress cannot authorize indefinite detention in the absence of a clear statement, the Court construed the statute to permit detention only while removal remained reasonably foreseeable. *Id.* at 690, 699. After a presumptively reasonable six-month detention, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701.

**[3]** Although *Zadvydas* dealt with the detention of aliens

---

[2]8 U.S.C. §1231(a)(6) provides:

An alien ordered removed who is inadmissible under 8 U.S.C. § 1182, removable under 8 U.S.C. § 1227(a)(1)(C), (a)(2), or (a)(4) or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to . . . terms of supervision.

who had been admitted to the United States, *see* 533 U.S. at 682, and construed a different statute, that case and its progeny remain instructive. In *Clark v. Martinez*, 543 U.S. 371 (2005), the Court held that *Zadvydas* applied to all categories of aliens whose detention was authorized by 8 U.S.C. § 1231(a)(6), including "those ordered removed who are inadmissible," because the phrase "may be detained beyond the removal period" had to be interpreted the same way in each case encompassed by the statute. *Id.* At 377, 378.

The *Clark* Court did not decide that the indefinite detention of inadmissible aliens presented the same constitutional problems in the same degree as the detention of admissible aliens. 543 U.S. at 380. To the contrary, the Court relied on the statute's applicability to admitted aliens and the necessity of consistent interpretation:

> The Government . . . argues that the statutory purpose and the constitutional concerns that influenced our statutory construction in *Zadvydas* are not present for aliens . . . who have not been admitted to the United States. Be that as it may, it cannot justify giving the *same* detention provision a different meaning when such aliens are involved. It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. * * * [W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the natural consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.

*Id.* at. 380-81.

The statutes cited by the government, 8 U.S.C. §§ 1225(b)(1)(B)(ii) and (b)(2)(A), apply to any alien an immigration officer determines to be inadmissible and to have a credible fear of persecution, and, in the case of § 1225(b)(2)(A), any alien the immigration officer determines not to be "clearly and beyond a doubt entitled to be admitted."**[3]** Therefore, although the *Zadvydas* Court referred to terrorism as the kind of issue that might permit extended detention, *see* 533 U.S. at 691 (internal quotation marks omitted) ("The provision authorizing detention does not apply narrowly to a small segment of particularly dangerous individuals, say suspected terrorists, but broadly to aliens ordered removed."); *id.* at 696 ("Neither do we consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respects to matters of national security."), because these statutes are not limited to such applications, they cannot be read to authorize the indefinite detention of supposed terrorists but only the brief detention of all others. This interpretation would abrogate the holding and reasoning in *Clark* by treating some detentions authorized by the same statute differently, depending on the identity and status of the detainee.

In addition, the Supreme Court has held that the existence of statutes authorizing the detention of suspected terrorists specifically precludes the use of general detention statutes to authorize the unlimited detention of terrorists. "The Court's interpretation of § 1231(a)(6) did not affect the detention of alien terrorists for the simple reason that sustained detention of alien terrorists is a 'special arrangement' authorized by a

---

**[3]**Some admissible aliens are likely detained pursuant to these provisions, particularly given § 1225(b)(2)(A)'s requirement that the admissibility be "clear[ ] and beyond [ ] doubt" according to the immigration officer. This fact only brings the cases even closer to the *Clark* situation: if admitted aliens can only be detained for a reasonable period, and admissible aliens may be detained pursuant to this statutory provision, then the statute can only authorize a limited detention. *See Clark*, 543 U.S. at 380.

different statutory provision, 8 U.S.C. § 1537(b)(2)(C)." *Clark*, 543 U.S. at 379 n.4.

**[4]** In short, applying the Supreme Court's statutory analysis to the instant case, we conclude that the general immigration detention statutes do not authorize the Attorney General to incarcerate detainees for an indefinite period. Rather, consistent with the Supreme Court's approach in *Zadvydas*, we conclude that the statutes at issue permit detention only while removal remains reasonably foreseeable. Further, consistent with *Zadvydas*, we conclude that after a presumptively reasonable six-month detention, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701.

B

**[5]** Our conclusion that the general detention statutes cannot be read as authorizing indefinite detention is bolstered by considering the immigration statutes as a whole. In fact, Congress has enacted provisions that allow the Attorney General to detain certain aliens for lengthy periods, but certain defined categories of aliens, and only with procedural safeguards.

Specifically, the Patriot Act allows detention of suspected terrorists or other threats to national security, 8 U.S.C. § 1226a and 8 U.S.C. §§ 1531-1537. However, in order to effect such lengthy detentions, the Attorney General is required to certify that the statutory criteria has been met, and the Attorney General must review the certifications every six months. Section 1226a contains the Patriot Act's authorization of detention of suspected terrorists, providing that "the Attorney General shall take into custody any alien who is certified" by the Attorney General where it is known or there are reasonable grounds to believe:

- the alien comes to the United States to engage in espionage or sabotage, § 1182(a)(3)(A)(i)(I); § 1227(a)(4)(A)(i);

- the alien comes to the United States to violate U.S. law relating to the export of goods, technology or sensitive information, § 1182(a)(3)(A)(i)(II); § 1227(a)(4)(A)(i);

- the alien comes to the United States to engage in any activity with the purpose of opposing or overthrowing the U.S. government, § 1182(a)(3)(A)(iii); § 1227(a)(4)(A)(iii);

- the alien has engaged in, is likely to engage in, or to incite terrorist activity, or is or was a member of a foreign terrorist organization. § 1182(a)(3)(B); § 1127(a)(4)(B); § 1226a(a)(1); § 1226a(a)(3).

The Attorney General may delegate the power to certify only to the Deputy Attorney General, who may not in turn delegate it. 8 U.S.C. § 1226a(a)(4). An alien detained under this section "whose removal is unlikely in the reasonably foreseeable future, may be detained for additional periods of up to six months only if the release of the alien will threaten the national security of the United States or the safety of the community or any person." 8 U.S.C. § 1226a(a)(6). The Attorney General is required to review certifications under this section at six month intervals. 8 U.S.C. § 1226a(a)(7).

Sections 1531-1537, enacted in 1996, establish the Alien Terrorist Removal Court and the procedures that it must follow. Upon receipt of "classified information that an alien is an alien terrorist," the Attorney General can file an application with the removal court and take the alien into custody. 8 U.S.C. §§ 1533(a)(1), 1536(a)(1)(A). That application must contain the Attorney General's certification that the applica-

tion satisfies the requirements of 8 U.S.C. § 1533, which include:

> a statement of the facts and circumstances relied on by the Department of Justice to establish probable cause that (i) the alien is a terrorist; (ii) the alien is physically present in the United States; and (iii) with respect to such alien, [standard removal proceedings] would pose a risk to the national security of the United States.

8 U.S.C. § 1533(a)(1)(D).

**[6]** By their own terms, both statutory provisions for the detention of suspected terrorists require that the Attorney General "certify" the case before such detention begins. 8 U.S.C. § 1226a; 8 U.S.C. §§ 1531-1537. Nadarajah's case has not been so certified. In addition, the other procedural protections of these statutes, including biannual reviews of certification, have not been conducted. 8 U.S.C. § 1226a(a)(7). Indeed, the government does not claim that the detention provisions for terrorists under the Patriot Act justify Nadarajah's detention. However, the existence of these provisions is important in the statutory construction of the general detention statutes upon which the government relies. The government's argument ignores a basic principle of statutory construction, namely that the specific prevails over the general. *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 916 (9th Cir. 2005) (citing *Santiago Salgado v. Garcia*, 384 F.3d 769, 774 (9th Cir. 2004)). Given that Congress has placed specific limits on the Attorney General's authority to detain suspected terrorists, those statutory provisions must govern such detentions, instead of the general detention provisions that apply to all aliens coming into the United States.

Further, the structure of the immigration statutes, with specific attention given to potential detentions of over six months in carefully defined categories, indicates that the period of

detention allowed under the general detention statutes must be construed as being brief and reasonable, as the Supreme Court has determined in construing similar provisions.

C

In sum, the government does not possess the authority under the general detention statutes to hold Nadarajah, or any other alien who is similarly situated, indefinitely. Rather, consistent with the construction given by the Supreme Court to similar statutes, the detention must be for a reasonable period, and only if there is a "significant likelihood of removal in the reasonably foreseeable future. After a presumptively reasonable six-month detention, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701.

IV

Applying the law to the facts of this case, we conclude that a writ of habeas corpus must issue and Nadarajah must be released from custody. The length of the detention in this case has been unreasonable. Nadarajah has established that there is no significant likelihood of removal in the reasonably foreseeable future. The government has failed to respond with evidence sufficient to rebut that showing.

A

**[7]** The nearly five-year detention in this case far exceeds both any period of confinement found reasonable by the Court, and the six-month period of presumptive reasonableness.

*Zadvydas* and *Clark* used the six-month period as the touchstone of reasonableness. In addition to its analysis in

*Zadvydas* and *Clark*, the Supreme Court has given further guidance as to what it considers to be a "reasonable" length of detention for aliens in *Demore v. Kim*, 538 U.S. 510 (2003). In *Demore*, the Supreme Court held that the government could detain aliens who had been convicted of a crime for "the brief period necessary for their removal proceedings." *Id.* at 513. In *Demore,* the Court discussed the data concerning detention length, noting that "[t]he Executive Office for Immigration Review has calculated that, in 85% of the cases in which aliens are detained pursuant to § 1226(c), removal proceedings are completed in an average time of 47 days, and a median of 30 days." 538 U.S. at 529. The Court noted that "[i]n the remaining 15% of cases, in which the alien appeals the decision of the Immigration Judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter." *Id.* The Court noted that Kim, the respondent, had been detained for over six months, which was "somewhat longer than the average." *Id.* at 530-31. However, the Court viewed that "temporary" confinement as permissible.

*Demore* was decided in the context of an alien convicted of a crime who was detained pending a determination of removability. Here, the IJ first determined that Nadarajah is entitled to relief in the forms of asylum and withholding of removal under the Convention Against Torture, and on remand determined again that Nadarajah is entitled to relief from removal in the form of asylum, which was affirmed by the BIA. Thus, Nadarajah's detention is more akin to the situation in *Zadvydas*, which was "indefinite" and "potentially permanent." 533 U.S. at 690-91. Nonetheless, *Demore* endorses the general proposition of "brief" detentions, with a specific holding of a six-month period as presumptively reasonable.

**[8]** A detention of nearly five years—ten times the amount of time the Supreme Court has considered acceptable absent a special showing—is plainly unreasonable under any measure.

The government argues, both in its briefing and at oral argument, that *Demore* stands for an entirely different proposition: an indefinite period of detention. It reasons that:

> [b]y referring to average and median, the Court did not, as Nadarajah tries to infer, restrict either its holding or its reasoning to those cases where detention falls within the average or median length of time. Of necessity, by referring to average and median detention times, the Court implicitly acknowledged that there would be shorter than average and longer than average detentions, and its approval of the average and median necessarily covers the short and long detentions that go into the mathematical equation to determine average and median.

In other words, the government is contending that by referencing EOIR's detention statistics, which described the average and median lengths of detention, the Court was adopting a rule that a detention of *any* length was entirely permissible because—of mathematical necessity—lengthy detentions would have to go into the calculation of the average and median times. This is a patently absurd reading of *Demore*. In *Demore*, the Court grounded its holding by referencing a "brief period," *id.* at 513, 523, of "temporary confinement." *Id.* at 531. There is no indication anywhere in *Demore* that the Court would countenance an indefinite detention.[4]

---

[4]The references to the brevity and limited nature of the confinement are found throughout *Demore*. *See id.* at 513 ("Congress . . . may require that [criminal aliens] be detained for the brief period necessary for their removal proceedings."); *id.* at 523 ("[R]espondent argued that the Government may not . . . detain him for the brief period necessary for his removal proceedings."); *id.* at 526 (noting the "Court's longstanding view that the Government may . . . detain deportable aliens during the limited period necessary for their removal proceedings"); *id.* at 529 n.12 (noting "[t]he very limited time of the detention at stake").

By any analysis, a five-year period of confinement of an alien who has not been charged with any crime, and who has won relief at every administrative level, is unreasonable under the standards set forth by the Supreme Court. Nor are we persuaded by the government's argument that because the Attorney General will someday review Nadarajah's case, his detention will at some point end, and so he is not being held indefinitely. No one can satisfactorily assure us as to when that day will arrive. Meanwhile, petitioner remains in detention.

B

**[9]** Nadarajah has established that there is no significant likelihood of his removal in the reasonably foreseeable future. He has been awarded asylum twice, as well as protection under the Convention Against Torture once. In assessing now whether it is reasonably foreseeable that he will be ordered removed, it is useful to place his success before the agency in a larger context. According to the Executive Office for Immigration Review, during Fiscal Year 2005, only 12% of aliens who applied for relief from removal were awarded such relief by an immigration judge. Executive Office for Immigration Review, *FY 2005 Statistical Year Book* (2006), D2. Eighty-four percent (84%) of the total immigration judge decisions were to order removal of the alien from the United States. *Id.* Of asylum cases reviewed on the merits, the rate of denial was 62%. *Id.* at K2. Immigration judges denied the relief of withholding of removal in 87% of the cases heard on the merits. *Id.* at K5. Relief under the Convention Against Torture is awarded even more rarely. During FY 2005, the grant rate by immigration judges was approximately 2%. *Id.* at M1. The fact that Nadarajah has won relief denied 98% of applicants is a powerful indication of the improbability of his foreseeable removal, by any objective measure.

Further, although the ultimate decision on whether to grant asylum is committed to the Attorney General's discretion,

relief under withholding of removal is mandatory if the petitioner establishes that his "life or freedom would be threatened" in the country to which he would be removed on account of one of the five protected grounds. 8 U.S.C. § 1231(b)(3)(A); *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1092 (9th Cir. 2005). Withholding of removal is also mandatory if the applicant meets his burden of proof regarding the likelihood of future torture on application for relief under the Convention Against Torture. 8 U.S.C.A. § 1231(b)(3); 8 C.F.R. §§ 1208.16-1208.18.

**[10]** Thus, at this juncture, the government is not entitled to remove Nadarajah to Sri Lanka, and no other country has been identified to which Nadarajah might be removed. Therefore, examining the circumstances objectively, one cannot say that his removal is reasonably foreseeable. The government has not rebutted this showing, although it has had every opportunity to do so.

## C

**[11]** Given the unreasonable length of Nadarajah's detention, the unforeseeability of his removal, and the failure of the government to rebut his showing that there is no significant likelihood of removal in the reasonably foreseeable future, the government's continued detention violates federal law, as construed by the Supreme Court. Therefore, he is entitled to the issuance of a writ of habeas corpus. Given this result, we need not reach any of the constitutional arguments advanced by Nadarajah.

## V

Nadarajah also contends that ICE abused its discretion in denying him parole. The statute governing parole, 8 U.S.C. § 1182(d)(5)(A), provides in pertinent part:

> The Attorney General may . . . in his discretion parole into the United States temporarily under such

conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien.

**[12]** The Attorney General has delegated this authority to a number of officials, including ICE "directors of field operations." 8 C.F.R. § 212.5(a). While the discretion in making a parole decision is quite broad, it is not without limits. *See Clark v. Smith*, 967 F.2d 1329, 1332 (9th Cir. 1992) (citing *Moret v. Karn*, 746 F.2d 989 (3d Cir. 1984)) ("We have no basis on this appeal to review the exercise of the discretion of the Attorney General in denying parole [under 8 U.S.C. § 1182(d)(5)(A)], although we observe that this discretion, while large, is not unlimited."). Indeed, "immigration officials clearly have the authority to deny parole to unadmitted aliens if they can advance a facially legitimate and bona fide reason for doing so." *Jean*, 472 U.S. at 853 (quoting *Jean II*, 727 F.2d 957, 977 (11th Cir. 1984)). If such a reason is advanced, the denial of parole is essentially unreviewable. *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001).

Nadarajah was initially granted parole, conditioned on the payment of a bond. When he tendered the money for the bond, several years after the order granting parole, parole was denied because the bond order was "stale." After he was awarded relief by the IJ and BIA, he again requested parole. These requests were denied because he "no longer m[et] the criteria for a bond."

**[13]** The agency abused its discretion in denying parole because the reasons it provided were not facially legitimate and bona fide. When the last request was made, the government's position had already been rejected by the IJ and the BIA. Further, Nadarajah had been granted parole previously. The apparent conclusion in 2004 that Nadarajah's continued detention was in the public interest, or that his release poses

a risk to national security, is based on facially implausible evidence, and ignores Nadarajah's evidence of the detention's deleterious effect on his health.

In the two cases in which we have upheld decisions by the Attorney General under the "facially legitimate and bona fide" standard, the factual basis for the reason offered by the Attorney General's delegate was undisputed. In *Noh*, 248 F.3d at 942, we upheld a visa revocation on the grounds, conceded by the alien, "that the visa had been obtained illegally." Similarly, in *Mason v. Brooks*, 862 F.2d 190, 193-94 (9th Cir. 1988), the alien sought parole in order to enter the United States to apply for citizenship. The Attorney General's delegate denied parole on the "facially legitimate and bona fide" grounds that a prior and undisputed conviction rendered the alien excludable. *Id.* at 195.

**[14]** Here, the evidence regarding humanitarian release was undisputed. The government has already received a full hearing on its contention that Nadarajah was a security risk, and its evidence has been rejected. Given these circumstances, we conclude that the agency abused its discretion in denying parole in 2004.

## VI

Also pending before the panel is Nadarajah's renewed motion for release pending appeal. We have authority to order such a release pursuant to Fed. R. App. P. 23(b), which provides:

> (b)   Detention or Release Pending Review of Decision Not to Release.
>
> While a decision not to release a prisoner is under review, the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a

judge or justice of either court, may order that the prisoner be:

(1)   detained in the custody from which release is sought;

(2)   detained in other appropriate custody;

(3) released on personal recognizance, with or without surety.[5]

Our consideration of this request is governed by *Maharaj v. Ashcroft*, 295 F.3d 963 (9th Cir. 2002), in which we determined that the proper standard for evaluating a similar motion was "the traditional standard for interim injunctive relief, [according to which] the moving party 'must show either (1) a probability of success on the merits and the possibility of irreparable harm, or (2) that serious legal questions are raised and the balance of hardships tips sharply in the moving party's favor.' " 295 F.3d at 966. As we have explained, "these two alternatives represent extremes of a single continuum, rather than two separate tests." *Immigrant Assistance Project of Los Angeles County Fed'n of Labor v. INS*, 306

---

[5]Given the text of the rule, the government's argument that "this Court should not consider, let alone grant, extraordinary relief by motion where entitlement vel non to release is the very issue on appeal," is baffling: such a release is precisely what the rule contemplates. *See also In re Roe*, 257 F.3d 1077, 1080 (9th Cir. 2001) (holding, assuming that federal court had the authority to release a state prisoner on bail pending resolution of habeas proceedings, that circumstances in inmate's case did not make such release appropriate); *United States v. Mett,* 41 F.3d 1281, 1282 (9th Cir. 1994) ("Fed. R. App. P. 23 governs the issue of the release or detention of a prisoner, state or federal, who is collaterally attacking his or her criminal conviction."); *Marino v. Vasquez*, 812 F.2d 499, 508 (9th Cir. 1987) ("Rule 23 establishes the authority of the federal courts to release both successful and unsuccessful habeas petitioners pending appeal."); *Mapp v. Reno*, 241 F.3d 221, 224-25 (2d Cir. 2001) (holding that the federal courts have the inherent authority to admit to bail habeas petitioners being detained by the INS).

F.3d 842, 873 (9th Cir. 2002) (internal quotation marks and citations omitted). Under this analysis, "the greater the relative hardship to the moving party, the less probability of success must be shown." *Id.* (internal quotation marks and citations omitted).

As indicated by the analysis of Nadarajah's habeas corpus claims, we conclude that he has shown a probability of success on the merits. The balance of hardships also favor releasing Nadarajah. There is undisputed evidence in the record that his health is deteriorating, a deterioration that is only exacerbated by continuing detention. Therefore, we grant the motion for release, subject to conditions to be set by ICE.

## VII

**[15]** In sum, we conclude that the general detention statutes relied upon by the government do not authorize indefinite detention. When examined under the analysis prescribed by the Supreme Court, Nadarajah's detention is unreasonable, unjustified, and in violation of federal law. ICE abused its discretion in denying parole during the pendency of these proceedings. Therefore, we reverse the judgment of the district court denying Nadarajah's petition for a writ of habeas corpus. We grant his motion for immediate release, subject to terms and conditions to be set by the appropriate delegate of the Attorney General.

**REVERSED.**